**KIRSCH v. UNITED STATES.**

No. 13785.

United States Court of Appeals
Eighth Circuit.

May 13, 1949.

Frank J. Comfort, of Des Moines, Iowa (Walter F. Maley, of Des Moines, Iowa, on the brief), for appellant.

William R. Sheridan, Asst. U. S. Atty., of Keokuk, Iowa (Maurice F. Donegan, U. S. Atty. and Cloid I. Level, Asst. U. S. Atty., both of Des Moines, Iowa, on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This is an appeal from a conviction and sentence under a charge of violating Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b).[1]

---

[1] 26 U.S.C.A. § 145(b): "(b) Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who will-

The indictment, in five counts, related to each of the calendar years 1941, 1942, 1943, 1944, and 1945. Count Four is typical of all five. It charged that defendant "did wilfully and knowingly attempt to defeat and evade a large part of the income tax due and owing by him to the United States of America for the calendar year 1944 by filing and causing to be filed * * * a false and fraudulent income tax return wherein he stated that his net income for said calendar year was the sum of $1,269.42 and that the amount of tax due and owing thereon was the sum of $176.96, whereas, as he then and there well knew, his net income for the said calendar year was the sum of $71,028.46, upon which said net income he owed to the United States of America an income tax of $44,663.92." The jury found the defendant not guilty on all but the fourth count.

The sufficiency of the indictment and the evidence is challenged on the ground that the indictment did not charge and the proof did not show that defendant committed any act other than to wilfully file a false and fraudulent return reporting a lesser tax than he actually owed, and that such allegation and proof is insufficient to constitute a felony under Section 145(b). It is argued that the wilful filing of a false or fraudulent return with intent to defeat or evade taxes constitutes a misdemeanor under Section 3616(a) of the Internal Revenue Code, 26 U.S.C.A. § 3616(a), and hence that transgression may not constitute a felonious attempt to evade or defeat the payment of taxes under Section 145(b). Section 3616(a) reads: "Whenever any person * * * delivers or discloses to the collector * * * any false or fraudulent * * * return * * * with intent to defeat or evade the * * * assessment intended to be made * * *, he shall be fined not exceeding $1,000, or be imprisoned not exceeding one year, or both * * *."

[1, 2] As to that part of the charge and proof relating to the report in his return of less tax than was due, defendant says that such a dereliction is defined as a misdemeanor by Section 145(a)[2] and that the two misdemeanors of filing a false return defined by Section 3616(a) and by Section 145(a) may not be combined to constitute the felony of attempting to evade taxes "in any manner" defined by Section 145(b). An examination of the record reduces that issue to an abstract question. The conviction did not rest alone upon the allegation and proof of a wilful filing of a false return falsely reporting taxes due. The sufficiency of such allegation and proof to sustain a conviction under Section 145(b) is therefore not presented. There was evidence by the Government, the truth of which was admitted by formal stipulation at the trial, that defendant was the owner of the Park Avenue Tavern during all of the years covered by the indictment and that he was the owner of a bank account carried in the name of the Park Avenue Tavern. The proof showed, and defendant admitted in his testimony, that the tavern license was issued in the name of his cousin, Joseph Wagner, who had no interest in the business and gave it no attention. He admitted that although the net income from the tavern belonged to him alone, the income tax returns for the business were made in the name of Joseph Wagner, which Wagner did not even sign. There was proof, cor-

fully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

[2] 26 U.S.C.A. § 145(a): "(a) Failure to file returns, submit information, or pay tax. Any person required under this chapter to pay any estimated tax or tax, or required by law or regulations made under authority thereof to make a return or declaration, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any estimated tax or tax imposed by this chapter, who willfully fails to pay such estimated tax or tax, make such return or declaration, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution."

roborated by the testimony of defendant himself, that he was engaged in the illicit sale of liquor during the years 1944 and 1945, from which he made commissions amounting to $1,859 during the two years, no part of which was reported in his return for the year 1944. It is true that the defendant denied that the splitting of his income and reporting part of it in the name of Joseph Wagner was wilfully done for the purpose of evading taxes, and explained that action by stating that he had a misunderstanding with the City authorities in 1941 and could not himself obtain a beer license, leaving the inference that the return of the income tax in Wagner's name was to conceal from the City authorities the fact that he owned and actually operated the tavern. It is also true that he explained that the reason for not reporting the commissions on the illicit liquor sales was because his tax accountant advised him not to report those commissions until he terminated those operations or those illicit operations would be sure to be discovered. He testified that after he was caught and convicted he reported all of the commissions in his return for 1945 and paid the tax on the whole as income for that year. But those explanations went to the question of the wilfullness of an attempt to evade taxes, which was a question for the jury. If there was need for proof of affirmative acts other than those defined as misdemeanors in Sections 3616(a) and 145(a) in furtherance of an attempt to evade taxes, it is contained in the record. His conviction therefore did not rest entirely upon proof of acts defined as misdemeanors by Sections 3616(a) and 145(a). A combination of acts constituting misdemeanors coupled with other affirmative acts designed to evade payment of taxes will support a conviction for felonious attempt to evade the payment of taxes under Section 145(b). As stated in Spies v. United States, 317 U.S., loc. cit. 500, 63 S.Ct. 364, 368, 87 L.Ed. 418: "If on proper submission the jury found these acts [other than the failure to file a return or pay the tax due], taken together with willful failure to file a return and willful failure to pay the tax, to constitute a willful attempt to defeat and evade tax, we would consider conviction of a felony sustainable."

The defendant earnestly insists and forcefully argues that the Government did not prove that he received income upon which the tax was not paid, and that the assumption of that fact in a hypothetical question was error. As heretofore noted, defendant owned a tavern. A checking account was maintained in the name of the tavern. The tavern was operated in 1944 by a manager named Thomas Hanlon. It was located in an industrial district in Waterloo. Many of its customers were employees of industries located in the near-by vicinity. On pay days at the industries a large amount of checks were cashed by the tavern for the employees of the industries. In order to have sufficient cash on hand at the tavern with which to cash these checks, before pay days Hanlon generally got it from defendant who got it from his deposit box where he kept a considerable amount of cash. Sometimes Hanlon would get it from the bank from the tavern's checking account. When the checks were cashed ordinarily they would be endorsed by the tavern and taken to the bank with the receipts from the tavern business and cashed. If it was convenient to do so, defendant was repaid then in cash or with checks for his advances. If it was not convenient to do that, all of the proceeds of the checks were deposited in the tavern's checking account or a portion taken "in change" for use at the tavern. If more cash was obtained in advance of a pay day for the purpose of cashing checks than was needed therefor, the excess was handled in the same manner. The deposit of the proceeds of these checks to the tavern account was frequent and in comparatively large amounts. Hanlon estimated the amount of the checks cashed at from $2,000 to $3,500 each week. The expenses of operating the tavern and expenditures for supplies were paid in cash. Each such expenditure was noted on a slip of paper and put in the cash register. At the end of each week a tax accountant regularly employed for that purpose came by the tavern and picked up these records of expenditures and the tape from the cash register showing income re-

ceipts from sales. The accountant kept the books of the tavern and made up the income tax for the tavern business (in Joseph Wagner's name) from these records. For the year 1944 the cash receipts reported were $35,431.26; the expenses, $30,090.76; and the net profit, $5,340.50, upon which a tax of $1,333.75 was paid in Wagner's name. For the year 1944 defendant filed a tax return showing gross income of $3,186.70, expenses of $1,916.42, and a net income of $1,269.42, upon which a tax of $176.96 was paid. The return which the defendant made in his own name for the year 1944 showed five items of rent from buildings owned by him in Des Moines and Waterloo, a "corn and hog A.A.A. check" for $100 and $600 in profits from real estate sales. The Government's proof showed purchases of liquor from defendant in 1944 totaling more than $16,900. Its evidence also showed that defendant purchased drafts and cashier's checks from the bank in 1945 on the following dates and in the following amounts: May 3, 1945, $6,680; October 11, 1945, $9,000; October 11, 1945, $5,000; October 11, 1945, $13,000; October 16, 1945, $6,500; October 18, 1945, $7,000; November 21, 1945, $3,375; November 21, 1945, $3,125. The Government offered in evidence the bank's record of the tavern's checking account and deposit slips showing all deposits made to that account. Mr. LeCocq was the zone Deputy Collector in Waterloo for the Internal Revenue Service who investigated defendant's returns. He testified that from the bank records the amount of "unidentified" deposits made in the tavern account were for 1944, $54,880.57, and for 1945, $40,029.06. From the bank's records he testified that defendant's personal account showed total deposits for 1941, $9,-094.35; for 1942, $12,013.15; for 1943, $23,-527.84; for 1944, $11,378.49; and for 1945, $9,445. Mr. LeCocq computed the net income for the tavern for 1944 by checking the tax accountant's records of expenditures for expenses of operation and supplies and accepting his figures therefor in the amount of $30,090.76. While the exact method of computation is not stated in the record, it appears that the total amount of the deposits in the tavern account during 1944, consisting of approximately $90,000, was treated as gross income. $35,431.26 of that total, representing the receipts of the tavern as shown by the cash register tape and the tax return made in the name of Joseph Wagner, was treated as identified income and the balance of $54,880.57 was treated as income, but "unidentified". From that total of approximately $90,000 income the tavern expenses of $30,090.76 was deducted, leaving as net income from the tavern approximately $60,000. To that figure of approximately $60,000 of assumed net income from the tavern was added the total deposits in defendant's personal checking account of $11,378.49, giving the figure of $71,028.46, alleged in the indictment to have been defendant's income for the year 1944. After allowing credit for certain deductions and exemptions not now material, the taxes due for 1944 were computed at $44,663.92, and so alleged in the indictment.

At the trial Mr. LeCocq, testifying as a Government witness, stated that he "endeavored to identify the deposits made in each of these accounts", but being unable to do so, "we have included them as income because they have not been identified". He further stated, "These unidentified deposits represent income to me for the purpose of conducting an audit of income." He stated that he had been told that "a lot of labor checks" had been cashed at the tavern but that he made no investigation to find out whether or not that was true. He said: "We had no way of determining whether or not part of the deposits were income and the rest was for money cashing checks, and have charged up the entire bank account as income." As an illustration, he testified that, "If Kirsch went to his safety deposit box and took out $2,000.00 and turned it over to Mr. Hanlon, who was working at the tavern to cash checks and then deposited $2,400.00, we would include the entire $2,400.00 as income. We included everything that went into those deposits."

Mr. Darland, an employee of the bank, testifying as a Government witness, stated that he frequently waited upon defendant at the bank and that on an average of about three or four times a month defendant cashed "payroll checks" and tavern checks and on some occasions, after cashing the

checks, defendant would go to his safety deposit box in the bank.

Mrs. Seger, another employee of the bank and another Government witness, testified that both defendant and Hanlon brought checks issued by various manufacturing industries in Waterloo [to the bank] which they had apparently taken in at their tavern and brought to the bank for conversion into cash. She said: "I can't remember what he or they did with them. Sometimes they were deposited and sometimes he would take the cash. Don't recall how often he did either. Maybe once a week he took the cash and other times he would deposit the payroll checks into the account of the Park Avenue Tavern." She further stated that she estimated that she waited on Mr. Kirsch more than two or three times a week and on Mr. Hanlon "several times a week".

It is readily obvious from the foregoing facts that the Government was fully cognizant of the fact prior to the trial that a large part of the deposits made to the credit of the tavern account did not represent income. At the trial, the senior Internal Revenue Agent for that District was called as an expert witness to testify to the tax owed by defendant for each of the years covered by the indictment. To him was propounded the following question: "Mr. Ogden, assuming that a resident of Iowa who during the calendar year 1944 and on December 31st of that year was a widower with no dependents and whose residence and principal place of business was at Waterloo, Iowa, whose regular annual accounting period was on the basis of the calendar year, and assuming that such person derived and received a gross income during the calendar year 1944 as follows: Gross rent from store building, Des Moines, Iowa $450.00, dwellings Des Moines, Iowa $220.00, Park Avenue building Waterloo, Iowa $900.00, Ankeny Street dwelling $150.00, and Peverill Apartments, Waterloo, Iowa, $766.70, and corn-hog AAA check $100.00, and profits from real estate sales $600.00, and unidentified deposits in his personal account of $11,378.49, and unidentified deposits in the Park Avenue Tavern account $54,880.57, and assume further that such was entitled to and allowed by the provisions of the Revenue Acts of the United States the following deductions: Taxes $884.90, Insurance $135.00, Travel expense $150.00, Attorneys and abstract fees $110.00, depreciation $580.00, sales tax $19.76, gas tax $5.76, auto license $31.00, and Iowa income tax $.86, or a total of $1917.28. What would be the amount of the income tax of that person?"

To that question the following objection was made: "Mr. Maley: Just a minute. The objection interposed to that question, and the form of the question, your Honor, is that it is incompetent in form, and the witness is incompetent to answer in the form addressed to the witness, because there is no proper foundation laid for the various items that are included in the question. It assumes items which are not included by proof in the record. It does not distinguish nor attempt to distinguish the items of taxable income or refer to any proof or failure of proof regarding said items, and upon the whole permits the witness to characterize in the form of a conclusion and characterize his testimony in the same method in a way that invades the ultimate conclusion and judgment of the jury in this case."

The following then occurred:

"The Court: Well, are you assuming that the unidentified deposits were income?

"Mr. Sheridan: Yes, sir.

"The Court: Well, you have got to put that in. Assuming that they were actually income, why then what would be the return.

"Mr. Sheridan: I thought I had that in, your Honor.

"The Court: You had it the unidentified deposits were income, but you have to assume they are income.

"Mr. Sheridan: Assuming the unidentified deposits were income?

"The Court: Maybe the jury will find those are not income, and then of course his answer would have no effect, but assuming they were income, then make your return.

"(Exception.)

"A. $41,813.06.

"Mr. Maley: What was that amount, please?

"A. $41,813.06.

'Mr. Maley: For the purpose of the record may I suggest, your Honor, you forgot to make a ruling on the last objection.

"The Court: I beg your pardon. Yes. Overruled, on the objection, with that amendment of the Court's there. I think the jury understands that what counsel is asking here, he is putting in these unidentified deposits as being income. Now, he is assuming that that is income, and he is giving his answer on that assumption, so that if you find that it is not income and the amount isn't the same on those unidentified deposits, why then, of course, this computation wouldn't be correct and you shouldn't consider it.

"(Exception.)

"Mr. Maley: Thank you."

██ It is proper to permit an expert witness to testify to what income taxes would be upon a hypothetical state of facts which have been proven by competent evidence. United States v. Johnson, 319 U.S. 503, loc. cit. 519, 63 S.Ct. 1233, 87 L.Ed. 1546. And that competent evidence may consist entirely of circumstantial evidence. Gleckman v. United States, 8 Cir., 80 F.2d 394. Nor is it necessary in a prosecution under Section 145(b) that the Government prove the exact amount of the tax attempted to be evaded. Cave v. United States, 8 Cir., 159 F.2d 464. But the question of whether the fact that a defendant had unreported taxable income may be established by the circumstance alone that his checking account at his bank totaled more than the gross income reported by him need not be determined. It may be conceded here, as it was in the Gleckman case, 80 F.2d loc. cit. 399, "that the bare fact, standing alone, that a man has deposited a sum of money in a bank would not prove that he owed income tax on the amount". The foregoing question need not now be determined because there was other circumstantial evidence, heretofore noted, of income in excess of that reported. And in addition, there was the admitted income in 1944 from illicit liquor sales which was not reported that year.

██ But none of the foregoing considerations will justify the unqualified assumption of a fact as true that is known to be false. The hypothetical question assumed without qualification that all of the deposits in the tavern account and in defendant's personal account constituted income for tax computation purposes. That assumption of fact was not only without evidentiary support even from permissible inference from proven facts, but was definitely disproved by the Government's own evidence. It is one thing for a party to say in effect, as was done in the Gleckman case, that he had exercised all of the means he reasonably could to determine how much of a bank account was income, had eliminated all that he could determine was not income, and was therefore assuming for the purpose of calculating taxes due that the remainder was income, and quite another and different thing to say in effect, as was done in this case—My evidence shows that all of these deposits were not income, but I do not know how much was not, I have made no effort to find out. So I am assuming that all are income and am casting the burden on the defendant to show, if he can, how much is not, or suffer the consequences. The latter procedure cannot be approved. It should never be necessary for the Government to negative a defendant's defense in a hypothetical question such as this. But it should always be necessary that the facts and circumstances put in evidence by the Government justify, by reasonable inference at least, the truth of the assumed fact. What constitutes a reasonable effort to establish the truth of the fact assumed, and what facts or circumstances will constitute a proper foundation for the assumption and permit a reasonable assumption of the truth of the fact assumed in the hypothetical question may not be narrowly circumscribed, but must be left to a considerable extent to the discretion of the trial court. But in this instance, there was no foundation for the assumption that all of the deposits constituted income.

██ The trial court, sensing the innate impropriety of the question, went far to eliminate its error and injurious effect by informing the jury that the truth of the fact that the "unidentified" deposits was income was for it to determine. But in doing so there was an inevitable invitation to the jury to assume that there was evi-

602

dence upon which it could find that all of the deposits were income when there was no such evidence.

The situation is the same here as it was in Winebrenner v. United States, 8 Cir., 147 F.2d 322, loc. cit. 329, when this court in condemning an improper admonition given a jury, the effect of which was impossible of ascertainment, said: "The effect of the admonition given in this case is, of course, impossible of ascertainment, but as it violates the principle that an accused is entitled to be heard before he is condemned, and the essentials to a fair trial, the judgments appealed from must be reversed."

In view of our decision on the foregoing question, it is deemed unnecessary to consider other contentions of defendant as the alleged errors complained of are not likely to occur on a retrial of the case.

The judgment appealed from is reversed and the cause remanded to the District Court with directions to grant defendant a new trial.