Max GREENBERG, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

No. 5834.

United States Court of Appeals First Circuit.

Nov. 7, 1961.

James R. McGowan, Providence, R. I., with whom Lester H. Salter and Salter & McGowan, Providence, R. I., were on brief, for appellant.

William J. Gearon, Asst. U. S. Atty., Woonsocket, R. I., with whom Raymond J. Pettine, U. S. Atty., Providence, R. I., and Frederick W. Faerber, Jr., Asst. U. S. Atty., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

The defendant was indicted in five counts, three for attempting to cause Star Pharmacy, Inc., a small Rhode Island drugstore corporation of which he was president, treasurer and sole stockholder, to file false and fraudulent income tax returns for the years 1952, 1953 and 1954, and two for willfully failing to file personal returns for the first two of those years. He was convicted on all counts. On appeal we reversed, partly because of the introduction of hearsay opinion of an Internal Revenue agent, who was allowed to testify on the basis of extra-judicial investigation and inquiry to the purposes, corporate or personal, of various corporate checks, to support the government's claim that they constituted personal income to the defendant. Greenberg v. United States, 1 Cir., 1960, 280 F.2d 472. As we said, on page 476, "No payee or other third parties testified at the trial. No records or admissions of the defendant corroborated this testimony." In a footnote we pointed out that had the records spoken for themselves "there would have been no need of Mr. Gray's testimony, a suggestion which the government has never made."

After empanelling at the second trial the government dismissed the two personal counts. The defendant was again convicted on the corporate counts, and he again appeals. Before considering the questions raised, many of which are evidentiary,[1] a rather full outline of the evidence is in order. In its opening the government stated that its single contention was that gross receipts "were substantially understated in the tax return[s], which resulted, of course, and

---

1. We do not find the defendant's claim that he was entitled to a mistrial to merit discussion.

was reflected in a lower net income and lower tax." The defense presented no evidence.

■ The first witness introduced the company's bank deposit tickets for the years in question, and stated the totals, and the fact that deposits were made approximately every nine to ten days. The next witness introduced the company's tax returns for 1947–1954, and the defendant's personal return for 1954. Pausing here, defendant's objection made to this last was not well founded.[2] The next witness, one Chernov, testified that he was employed to run the drugstore during the hours that the defendant was absent; that he paid for small items of merchandise when they were delivered out of a petty cash drawer kept for that purpose; that his weekly salary with one exception was always paid in cash, many times out of the defendant's pocket, and a few times out of the register. Copies of the W-2 forms for his total pay were introduced.

■ The next witness was one Jarcho, a c. p. a., who testified that at the request of defendant's counsel in 1955 he examined the company's records for the years 1952–54, which consisted of cancelled checks, bank statements, checkbook stubs, and for 1954 "a little composition book which listed various daily paid-outs and cash receipts;"[3] that a few checks were missing, and that there were no check stubs for the year 1953 and part of 1954; that these were all furnished to him by the defendant, who stated during their only conversation that these were all of his records. Over the objection of defendant the witness testified that he reconstructed records for the years in question; but since it appeared that this was based in part upon the same vices which we found in Gray's testimony on the prior appeal, the court at first did not allow the government to proceed further. The "little composition book" for 1954 was introduced in evidence, and the witness was then permitted to testify with respect to that year. He stated that he formed an "opinion" as to the company's gross receipts for 1954, using the bank deposits method; that he took the total deposits; that in the absence of checks for salaries he added Chernov's and the defendant's disclosed salaries, as representing additional cash, i. e., gross receipts, and similarly added the cash outlays for merchandise as shown in the composition book. He testified that from this gross amount he deducted certain payments made of defendant's personal funds in the bank account, and payments made to the American Express Company as the result of sales of American Express Company checks.[4] The witness testified as to his opinion of the company's gross receipts for the year 1954, but the record fails to show what he said. He then testified that with respect to 1952 he added to the gross receipts shown by the bank deposits the cash expenditures for salaries and wages, but added nothing for petty cash disbursements for mer-

---

2. The defendant's personal return showed payments of dividends to him by the company in 1954 of $3,914, which was not disclosed on the company's information schedule. The company returns showed a net loss during the years 1947–1950 of $2,200, and net income, after taxes, in 1951–1954 of $2,800, a profit of $600 in eight years. The government asks, if defendant believed these returns accurate, where he thought nearly $4,000 for dividends had come from.

3. While perhaps beyond our province, we cannot help but observe that if the jury had concluded from internal evidence that this book was, precisely, an exercise in composition, and not the daily entry it purported to be, we would have no quarrel with that finding.

4. The defendant sold Express checks. The government gave the company credit against gross receipts for all payments it made by check to the American Express. Defendant objects that the government should have proved, by summoning the American Express and examining its records, when the company received that money in, not when it paid it out. We may doubt whether the Express Company records would have shown this. In any event, there was an obligation upon the defendant to keep records, which was unsatisfactorily met. He cannot object to this use of his checks.

chandise; that he deducted the defendant's personal payments into the account, certain returned items, and the American Express payments, which gave him an adjusted gross figure of $57,234.[5] The corresponding figure on the company's return was $52,632.

After some further testimony the government called Gray, the special agent, who may be said to have testified over defendant's continuous objection. Without detail, the substance of his testimony was that he examined all of the records furnished him by the defendant; that he selected the checks which, either because of some entry in the records or because of personal inquiry, he felt represented payments for merchandise, and obtained a total for each year; that he gave the defendant the benefit of every doubt by classifying doubtful checks as merchandise checks. The checks so selected were introduced in evidence. He stated that as to each year the total so obtained was smaller than the amount declared on the return for purchases taken as a deduction against gross receipts as an expense of doing business. He stated that he then assumed that the difference between these totals represented cash payments for merchandise, and therefore that that amount of cash had been additional gross receipts which had not gone into the bank account. He similarly added to the gross receipts figure the salaries of Chernov, which Chernov testified had been paid in cash, and the declared salary of the defendant himself, which the defendant had admitted had been paid in cash. He testified that he did not consider that these salaries had been paid in any fashion out of the bank account, giving as his reason that there were no checks made payable to either Chernov or the defendant, and that the total of the checks payable to cash was "negligible," far below any such amounts. He further testified that he determined certain checks to be so-called "exchange items,"

which he deducted from the gross receipts as not representing income, and that, again, in selecting such checks he had given the defendant the benefit of the doubt. As a result of such computations the witness attributed to the company gross income in each of the first years in question of over $9,000 more than the gross income shown on the returns, and in 1954 of $5,000. This, in turn, meant a larger net and taxable income than reported, and consequent understatement of the tax due. There was further testimony, but defendant raises no additional points with regard thereto.

■■ We consider first the question whether, if all these matters were properly proved, the defendant's motion for acquittal on the ground of lack of evidence of willfulness should have been granted. It is frequently said, as defendant argues, that proof of falsity of the return is not ipso facto proof of willfulness. This does not mean that such evidence may not have a direct bearing on the question whether defendant knew of the falsity. Usually such knowledge must be a matter of inference. If, for example, a defendant is a prodigal spender, but claims a loss every year on his returns, the inference may be obvious. It is less obvious in the case at bar, but we think it is permissible. In 1952 and 1953 the defendant kept no records except bank statements, checks and stubs, which showed nothing but the name of the payee and the amount. (By the time of investigation many even of these had disappeared.) There was no suggestion that there ever had been other records. The defendant's own accountant, employed by him to reconstruct the company's returns after difficulties arose with the Service, could do so only in such a way that defendant objected to his testimony in court as worthless. The jury was well warranted in finding that the detailed figures in the return came from his imagination. There was not

---

5. Included in this figure was a year-end adjustment for cash-on-hand. The defendant attacked the theory upon which this was computed. We do not think it unreasonable. On the other hand, government witness Gray, infra, appears to have made no adjustment at all.

even the control that many small taxpayers have of putting everything through their bank account. The jury could find that defendant knew that substantial amounts of money never went into the bank. Defendant's method of doing business, meeting daily and weekly expenses out of the till, with, apparently, not even a purported record in 1952 and 1953, might be thought by a jury the most elementary indicia of fraud, as "conduct, the likely effect of which would be to mislead or to conceal." Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418; Holland v. United States, 1954, 348 U.S. 121, 125, 128, 75 S.Ct. 127, 99 L.Ed. 150.[6] There are other matters which we do not pause to relate. The defendant's motion for acquittal was properly denied.

■■ The defendant's other objections fall into two categories. We take the latter first. He objects to the failure of the court to give certain requests instructing the jury as to the nature of the government's bank deposit method, and particularly its assumptions and weaknesses. To be considered in conjunction with this is the fact that the court even prevented defendant's cross-examination designed to illuminate the jury on this subject. The charge, as defendant points out in his brief, contained merely the usual definitions of fraud and cautions as to the burden of proof and generalizations appropriate to any income tax case. We suggest that a criminal prosecution is rarely entirely routine and that it may normally be helpful for a jury to be given instructions somewhat more specifically applicable to the case at hand. But be that as it may, the court has held that a defendant is clearly entitled to a special explanatory charge when the government proceeds on the basis of net worth. Holland v. United States, supra, 348 U.S. at 129, 75 S.Ct. at 132. The complexities of the bank deposit method, particularly as they existed in the case at bar, called for no less.

This leads us into the serious evidentiary objections. Gray's theory of building up the company's gross receipts by deducting from the merchandise expense item on the returns the amount paid for merchandise by check and attributing the balance to non-bank account cash, which, in turn, he labelled additional gross receipts, was entirely fair. See n. 6, supra. But it presupposed that Gray had correctly stated the total of the checks. As to this the government says in its brief, "The government's case rested primarily on the testimony of Special Agent Gray. There is no question as to the reliability of Gray's testimony or that it was fair or accurate." "* * * the figures calculated were based on a reliable and accurate analysis resulting from all available records." Apart from the fact that this brief was written after defendant-appellant had filed a brief raising many serious questions as to Gray's reliability, his figures were demonstrably, and concededly, not based upon records in this trial any more than they were in the first. Asked to give the basis of his analysis, he stated, "* * * the check stubs * * * the checks themselves, endorsements and independent inquiry of my own." "* * * my own knowledge of the character of the payee—" "* * * the kind of business [it] was in." "We would use

6. The defendant says of course that there were records, how else did the government obtain the figures on which it seeks to convict? This is a bit of sophistry. Passing the point that the defendant objects to the government figures as totally unreliable, defendant overlooks the fact that some of the government reconstruction comes from oral testimony, and some is based on the hypothesis that defendant's claimed expense deductions were accurate even though no figures existed to support them. This was an unimpeachable trial hypothesis, because if the deductions were excessive, the company's net, ipso facto, should have been larger. On the other hand, there was no burden on the government to seek out and prove that defendant had not taken enough deductions, if that matter did not readily or independently appear.

directory services and yellow page listings in the telephone book." [7]

■ We fail to see how Gray's evidence could be described as unquestionably reliable or in any way outside of our condemnation on the prior appeal. The government attempts two answers. First, it points to Gray's testimony that in cases of "doubt" he gave the defendant the benefit of the doubt, and therefore made the total of the checks as large as possible. However, the basis upon which his doubts were determined was in no way described. Gray's computations allowed the defendant the benefit of less than half of the total number of checks issued by the company in each year. It appears simply that after he had made such independent extra-judicial inquiry as he saw fit, on the basis of what he had learned Gray placed each check in one of three categories, deductible, doubtful, and·not deductible. On his testimony at the second trial we must find that the same, or similar hearsay which we condemned on the first appeal still affected his determination, causing him to exclude checks from the affirmative or doubtful lists which made up the total check payments for corporate merchandise.[8]

The government seeks to avoid our earlier decision on a broader basis. In its brief on the first appeal the government argued that Gray's testimony based upon his extra-judicial inquiry was not offered for proof of the ultimate purpose of the checks, but only for proof of Gray's state of mind. This argument, of course, we rejected. 280 F.2d 472 at 476–477. It now, perforce, agrees that the purpose of the checks was then of "prime importance," but argues that the present

question is entirely different. Its theory is that in the previous case the ·question was whether the purpose of the particular checks was corporate or non-corporate, i. e., for the company's benefit or defendant's individual benefit, whereas it is now conceded by the government that the checks were for corporate purposes. The speciousness of this distinction seems only too apparent. The single question still is the purpose of the checks. There is no difference in kind, or in the hearsay quality of the inquiry, whether the checks are to be divided between corporate and non-corporate purposes or between corporate-merchandise and non-merchandise purposes. Indeed, as we have already indicated, exactly the same inquiry is involved; if previously Gray determined a check to be non-corporate, by the same token he would now determine it to be non-merchandise.

Pursuing this matter still further, it is apparent that in substance the government was not really seeking to determine which checks were merchandise. It was, rather, seeking to determine what checks were non-merchandise, so that Gray could say, "I have not found checks for so many dollars of merchandise expense claimed on the return, therefore the balance must have been cash, not paid out of the bank account." In other words, the substance and effect of Gray's testimony was that on the basis of his own personal knowledge, or extra-judicial inquiry, he had determined that several hundred corporate checks were for non-merchandise purposes, although, as in the previous case, neither the checks nor the company records were found to disclose any such thing. The government was previously trying to show, through the alleged purpose of certain checks, additional income

7. In addition, Gray testified that with respect to 1953, when stubs were missing, he relied upon Jarcho's "reconstruction." It seems to have escaped notice that Jarcho's reconstruction was excluded by the court for lack of sufficient verifying evidence.

8. The government makes the contention that the defendant should have cross-examined Gray and brought out such errors

in its defense. The claim that the government can make out a prima facie case by hearsay evidence, and then say the evidence must be good or the defendant would have rebutted it, calls for no comment. We may say the same for its argument that the evidence "was worthy of belief" or the jury would not have believed it.

to the defendant. Now it is similarly attempting, through indirection, to show additional income to the company. It is just as bad to back up a forbidden path as it is to walk up it.

Judgment will be entered vacating the judgment of the District Court and remanding the action for further proceedings not inconsistent herewith.