**UNITED STATES of America, Appellee,**

**v.**

**John R. MORSE, and Alice Morse, Appellants.**

**No. 73–1248.**

United States Court of Appeals, First Circuit.

Argued Dec. 4, 1973.

Decided Feb. 5, 1974.

Robert D. City and Murray H. Falk, Boston, Mass., with whom Moulton, Looney, Mazzone, Falk & Markham, Boston, Mass., was on brief, for appellants.

Alan R. Hoffman, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

Defendants were convicted of willful evasion of federal income taxes, in violation of 26 U.S.C. § 7201 (1970), and of making materially untrue and incorrect tax returns, in violation of 26 U.S.C. § 7206(1) (1970), and were sentenced accordingly.[1] On this appeal, defendants urge a considerable number of grounds for reversal, but their primary contention concerns certain evidentiary matters relating to the government's use of the bank deposits method of reconstructing gross income.

Despite the fact that all taxpayers are under an affirmative statutory duty to maintain adequate records for tax purposes, 26 U.S.C. § 6001 (1970), Treas.Reg. § 1.6001–1(a) (1973), this requirement has not always been complied with. In a situation where adequate records do not exist or access to them is not available, the government, in attempting to establish a violation of the income tax laws, may reconstruct a taxpayer's taxable base by any reasonable method. United States v. Firtel, 446 F. 2d 1005, 1006–1007 (5th Cir. 1971) (per curiam). Among the methods which have received consistent judicial approval is the bank deposits theory of gross income calculation. See United States v. Lacob, 416 F.2d 756 (7th Cir. 1969), cert. denied, 396 U.S. 1059, 90 S.Ct. 755, 24 L.Ed.2d 754 (1970) rehearing denied,

---

1. Defendant John Morse was convicted on a total of six counts relating to income tax returns filed in 1966, 1967, and 1968. He was acquitted of all charges with respect to his 1965 return. Defendant Alice Morse was convicted on two counts relating to the 1968 return.

397 U.S. 1003, 90 S.Ct. 1114, 25 L.Ed.2d 415 (1970) ; Morrison v. United States, 270 F.2d 1 (4th Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 150 (1959).[2] In order to legitimately avail itself of this approach, the government must initially introduce evidence to show (1) that, during the tax years in question, the taxpayer was engaged in an income producing business or calling; (2) that he made regular deposits of funds into bank accounts; and (3) that an adequate and full investigation of those accounts was conducted in order to distinguish between income and non-income deposits. United States v. Frank, 151 F.Supp. 866, 868 (W.D.Pa.1956), aff'd, 245 F.2d 284 (3d Cir.), cert. denied, 355 U.S. 819, 78 S.Ct. 25, 2 L.Ed.2d 35 (1957) ; Gleckman v. United States, 80 F.2d 394, 399 (8th Cir. 1935), cert. denied, 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996 (1936). Once this preliminary foundation has been laid, the government totals all bank deposits, and, after the non-income deposits are excluded, United States v. Lacob, *supra,* 416 F.2d at 759, and the amounts on deposit prior to the tax years in question have been deducted, *see* Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964), the circumstantial inference properly permitted to arise is that all remaining deposits constitute taxable income. United States v. Doyle, 234 F.2d 788, 793 (7th Cir.), cert. denied, 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87 (1956). The government then includes any additional income which the taxpayer received during the tax year but did not deposit in any bank account, and the resulting total would be the taxpayer's reconstructed gross income. From this amount, the appropriate tax deductions, exclusions, exemptions and credits to which the taxpayer is entitled are taken, leaving a net income upon which is computed the amount of tax due. This is then compared with the actual tax paid in the years in question. *See* Percifield v. United States, 241 F.2d 225, 229–230 n. 7 (9th Cir. 1957) ; Morrison v. United States, *supra,* 270 F.2d at 2–3.

■ In the instant case, due to the inadequacy of defendants' records, the government resorted to the bank deposits method in order to prove that defendants' gross income for the tax years in issue had been substantially and knowingly understated on their returns.[3] After satisfying all the preliminary requirements for adoption of this approach, United States v. Frank, *supra,* the government introduced bank records, deposit slips, balance statements, and certain customer checks, to establish the total amounts which the defendants had deposited in their six bank accounts. Internal Revenue Service Special Agent Arthur Ansbigian, who conducted the bank deposits investigation, was called to testify concerning these records. His summaries of this and other evidence were exhibited to the jury in the form of several chalks.[4] After testifying with respect to the total bank deposits,

---

2. Other frequently used approaches include the "net worth" method, *see* Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1955), the "specific item" method, *see* Greenberg v. United States, 280 F.2d 472 (1st Cir. 1960), and the "cash expenditure" method, *see* Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), aff'd per curiam, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). For a concise description of the relative differences between the various methods see Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964).

3. It is well settled that under the bank deposits theory, the government is not obliged to prove the exact amount of the understatement, but merely that it has been "sub-

stantial." United States v. Procario, 356 F. 2d 614, 618 (2d Cir.), cert. denied, 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966) ; Kirsch v. United States, 174 F.2d 595, 601 (8th Cir. 1949).

4. In all, five chalks were eventually submitted to the jury. Chalk # 1, the summary chart, outlined the step-by-step approach taken by the government in calculating defendants' understated gross income. The first line of this chalk indicated the total amount of bank deposits for each of the years in question (1965–1968). The second line indicated the amount of non-income deposits which, when subtracted from line 1, left the total amount of deposited income. To this amount was added all income which

Agent Ansbigian indicated in some detail the procedures he adopted to determine all non-income deposits. As these deposits were identified, they were deducted from the total deposit amount. Ansbigian then testified as to undeposited business income, primarily in the form of customer checks which had been cashed or endorsed over to third parties. This testimony was supported by the relevant documentary evidence, and the ascertained amounts were added to the bank deposit total to produce reconstructed gross income.

■■ With respect to these calculations, defendants strenuously object to the nature of the government's evidence concerning the non-income deposits deduction. They urge that, unlike the evidence respecting total bank deposits and undeposited business income, the non-income deposits evidence was unsupported by independent documentation and corroboration, and essentially constituted inadmissible hearsay.[5] We agree and reverse for a new trial.[6]

Agent Ansbigian testified that upon completion of a thorough investigation, and after giving the defendants the benefit of every doubt, he was able to discern eight categories of non-income deposits, with amounts as follows:[7]

|  | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|
| (1) LOAN PROCEEDS | $24,055.66 | $17,208.00 | $ 32,600.00 | $ 8,000.00 |
| (2) INTER-BANK TRANSFERS | 860.00 | 11,000.00 | 27,480.00 | –0– |
| (3) CURRENCY DEPOSITS | 2,580.00 | 7,045.00 | 6,437.00 | –0– |
| (4) CUSTOMER CHECKS RETURNED | 57.50 | 712.00 | 357.96 | –0– |
| (5) PROCEEDS FROM SALE OF LAND | –0– | 50,000.00 | 94,132.21 | –0– |
| (6) PROCEEDS FROM SALE OF TRUCK | –0– | –0– | –0– | 6,000.00 |
| (7) RETURNED CERTIFIED CHECK | –0– | –0– | –0– | 500.00 |
| (8) UNIDENTIFIED | 12.00 | 2.00 | 2,722.07 | 1,462.50 |
| TOTAL NON-INCOME DEPOSITS (Excluded from Total Bank Deposits) | $27,565.16 | $85,967.00 | $163,729.24 | $15,962.50 |

the government determined had not been deposited, and, after certain adjustments, the resulting total was taken as the taxpayers' reconstructed gross income. The income actually reported by the taxpayers was then subtracted, leaving the understated amounts of gross income. For the years in question, these amounts totalled $22,575.21 (1965), $25,120.21 (1966), $25,280.73 (1967), and $40,479.82 (1968).

Chalk # 2 exhibited a breakdown of the total bank deposits from each of defendants' bank accounts. Chalk # 3 contained an itemized list of the non-income deposits which had been excluded. Chalk # 4 listed defendants' undeposited business income. Chalk # 5 contained a computation of the amount of tax owed by the defendants on the basis of their understated gross income. For the years in question, these amounts were $182.80 (1965), $1,811.30 (1966), $5,148.52 (1967), $10,047.06 (1968).

5. Despite the government's contention, we find adequate and timely objection in the record to the admission of this evidence.

6. Defendants also contend that this hearsay evidence compromised the validity of the submitted chalks as permissible jury aids, particularly chalks 1, 3 and 5, see note 4 supra, and that their admission was consequently prejudicial. We feel constrained to agree since, in view of the "inherent dangers" of such chalks, see Lloyd v. United States, 226 F.2d 9, 17 (5th Cir. 1955), their use must be fully supported in all respects by corroborating admissible evidence. United States v. Moody, 339 F.2d 161, 162 (6th Cir. 1964); cf. McGarry v. United States, 388 F.2d 862, 868 (1st Cir. 1967), cert. denied, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969).

7. These figures comprised the government's Chalk # 3. The "total Non-Income Deposits" were carried forward to the summary chart, Chalk # 1, for the purpose of ascertaining reconstructed gross income. They were also used, implicitly, in Chalk # 5, wherein the government sought to establish the amount of tax allegedly due on defendants' understated gross income.

However, despite the fact that Ansbigian arrived at these figures, in part, through extra-judicial inquiry and a careful review of related documents, the government made no attempt to support his analysis through the introduction of any corroborating witnesses or available records. Rather, the government apparently took the view that since these items are credits to the taxpayer, even if hearsay and not adequately proved, no prejudice resulted.

Such an approach loses sight of the true nature of the government's total objective, and its burden. The significance of the agent's allowing a non-income deduction is not the concession, but the corresponding implication that it should not be larger. We may agree with the government that such a negative implication may not be provable with the particularity that is required for proof of affirmative receipts, *cf.* Greenberg v. United States, 295 F.2d 903 (1st Cir. 1961), but the agent does have an overall burden to prove that he has done the best he can to discover, and exclude, all non-income items from the reconstructed income. Where direct evidence is available as to their existence and magnitude, there is no need to rely on the agent's hearsay assertion that they were no larger than he had accounted for.[8] Accordingly, we cannot accept the government's position.[9]

The damaging nature of the non-income deposits hearsay evidence in issue here might best be illustrated with an example. With respect to deposited loan proceeds, an obvious non-income deduction, the agent testified that

"I had copies . . . of liability ledger cards, listing all the loans, renewals, payments, new loans, I had all

of that. Examining the liability ledger cards I determined the loans.

\* \* \* \* \* \*

"I traced loan proceeds to all bank accounts to see if the bank account was credited or the proceeds were deposited. If they appeared as a deposit, they would be in this top line here. I would add a schedule showing loan proceeds and the dispositon of them. Anything that was deposited comes out, anything. There were several instances in which the loan proceeds were not deposited."

Nonetheless, with but one exception (pertaining to the 1965 return), the government made no effort to introduce the ledger cards into evidence. Thus, neither court nor jury were provided with any independent corroboration of the purported total amounts of loan proceeds. Moreover, without the ledger cards, they lacked any knowledge of the particular banks from which the loans were received, the dates thereof, and the amount of each individual loan. All they had was hearsay evidence from Ansbigian regarding the final results of his extra-judicial investigation.

Plainly stated, in computing the deduction for deposited loan proceeds, the agent not only examined the bank deposit records, which were admittedly in evidence before the jury, but examined the liability ledger cards as well. Knowing the amount of each loan, its date, and the bank from which it was obtained, put the agent in a better position to evaluate the bank deposit records to ascertain the amounts of deposited loans. However, in the absence of the ledger cards, the jury was at a significant disadvantage should it seek to corroborate the agent's testimony. Thus, without any meaningful documentary corrobora-

8. To be sure, the court must rely on mere assertion when the agent testifies that he could find no evidence of other non-income items, but then, of course, no better evidence would exist.

9. In its brief, the government contends that "as long as the total bank deposits were

properly in evidence, it was not required to prove with particularity each elimination or exclusion from total bank deposits, but could rely on the Special Agent's testimony as to the scope and character of his investigation to negative the likelihood that deposits remaining after eliminations had been made arose from some non-taxable source."

tion of an important aspect of Ansbigian's testimony, it had virtually no choice but to rely exclusively on his hearsay conclusion that his allowance was the maximum deduction. Moreover, without admissible independent documentation, neither the trial court, nor this court is in a position to adequately evaluate the accuracy of the amount of deposited loan proceeds determined by Ansbigian as available for non-income deductions.[10] In order to eliminate the hearsay aspect of his testimony the government should have introduced all available evidence upon which the agent based his non-income deposit calculations. *See* Siravo v. United States, 377 F.2d 469, 474 (1st Cir. 1967); United States v. Doyle, *supra*. As we view the record, this would not have presented the government with any serious or substantial burden.[11]

In light of the fact that we are reversing for a new trial, it appears appropriate to pass upon such other contentions raised by the taxpayers which seem likely to recur on remand.

The taxpayers allege that potentially damaging statements obtained from them, under oath, at an October 19, 1970, interview with IRS officials should have been suppressed on the grounds that proper cautionary warnings, as required by IRS News Release IR–949 (November 26, 1968),[12] had not been given.[13] In addition, they contend that a certain document obtained from their accountant, Timothy Demakis, should have been suppressed for similar reasons.[14]

It is undisputed that at the October 19 meeting, when the taxpayers were first formally interviewed, they were never fully apprised of the warnings mandated by the 1968 News Release. However, the government contends, and the record reveals, that when the IRS agents initially contacted the taxpayers in August 1969 for the purpose of discussing their tax returns, the agents were referred to their lawyer, James Bagshaw. The record further establishes that, as a consequence, an IRS offi-

---

10. Similar hearsay evidence affected the agent's testimony regarding inter-bank transfers, returned checks, and sales proceeds. Neither the corroborating witnesses nor the bank microfilm and memoranda upon which Ansbigian relied in ascertaining the amounts of these permissible non-income deductions were introduced into evidence.

11. The problems connected with introducing evidence in the instant case, if any, can in no way be compared with those confronting the court in Beard v. United States, 222 F. 2d 84 (4th Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753 (1955), upon which the government places heavy reliance.

12. The News Release provides, in relevant part:

"At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding."

13. Alternatively, the taxpayers assert that these statements should not have been ad-

mitted into evidence because the interview was conducted in violation of Treasury Regulation § 601.107(b)(2) (1973) which requires governmental disclosure of certain aspects of the proposed criminal charge. The district court, after conducting a full evidentiary hearing, determined that IRS officials did, in fact, sufficiently inform the taxpayers of the nature and essence of the proposed charge, as required by the regulation. The record provides ample support for this conclusion.

14. The taxpayers further urge that this document should have been suppressed because Demakis allegedly acted without their consent. However, the district court concluded that Demakis had received the taxpayers' implied consent to handle their affairs in any appropriate manner, and that, in making the document available to the government, he acted with "apparent authority." Upon careful review of the record, we are in complete accord. Moreover, we note that even in the absence of the taxpayers' consent, it is unlikely that any of their constitutional rights would have been violated by Demakis' decision to transmit the document to the IRS. *See* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

cial thereafter met with Bagshaw on September 19, 1969. At that time, the official, after discharging his obligation under the 1968 News Release,[15] described in some detail the nature of the civil and criminal charges against the taxpayers which were then under consideration.

Thus, the question which we must decide, under these facts, is whether the IRS sufficiently complied with the 1968 News Release by giving adequate and full warning to the taxpayers' attorney prior to their initial October 19 interview. We note that while the warnings required by the 1968 News Release would not be constitutionally compelled under Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at least where, as here, the prospective defendants are not in custody, see, e. g., Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), aff'd per curiam, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969); Spinney v. United States, 385 F.2d 908 (1st Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); Schlinsky v. United States, 379 F.2d 735 (1st Cir.), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967), failure to comply with that Release will nonetheless result in suppression of all evidence so obtained. United States v. Leahey, 434 F. 2d 7 (1st Cir. 1970). Where the Internal Revenue Service has adopted specific procedures "designed to protect taxpayers by setting a clear and uniform standard governing" relations between the IRS and those suspected of tax fraud, due process demands adequate adherence to those announced procedures. Id at 11. However, it is the substance and spirit of such procedures, and not their literal form, which must be complied with. United States v. Mathews, 464 F. 2d 1268 (5th Cir. 1972) (per curiam); United States v. Bembridge, 458 F.2d

1262 (1st Cir. 1972). While it would, in our view, be the preferable approach to give taxpayers the required warnings *personally* at their initial interview, we decline to adopt a *per se* rule of exclusion where this is not done. The 1968 News Release warnings were designed to protect the rights and immunities of potential criminal defendants. Where, as the record reveals in the instant case, the taxpayers have explicitly referred all IRS inquiries to their attorney, where such attorney is given the requisite warnings at his initial meeting with the Special Agents, and where the attorney accompanies the taxpayers to their interview and competently represents them therein, the broad policy designs of the 1968 Release have been satisfied. In such situations, it can be fully expected that the rights of taxpayers would, at the very least, be as amply protected as they would be if the exact letter of the Release had been carried out. Consequently, to exclude the evidence resulting from such an interview would be unjust and inequitable with respect to the rights of the government, and would require slavish deference to the technical language of the News Release even where its fundamental policy goals have not been compromised. *Cf.* United States v. Bembridge, *supra,* 458 F.2d at 1264.

The taxpayers' remaining contentions merit little discussion. They assert that as the result of an apparently inexplicable two month delay between the impaneling of a jury and the commencement of trial, they were denied their sixth amendment rights to a speedy trial. Whether a defendant's right to a speedy trial has been prejudiced depends upon evaluation of an *"ad hoc* balancing test in which the length of delay, the reasons for the delay, the accused's assertion of his right, and the prejudice to the accused resulting from

---

15. The taxpayers assert that Bagshaw possessed only a limited power-of-attorney and was thus not authorized to receive the News Release warnings in issue. This contention, however, is completely without merit. The power-of-attorney executed in Bagshaw's favor was on a standard form and clearly authorized him to "represent the taxpayer(s) before any office of the Internal Revenue Service." We agree with the district court that the scope of this "representation" included the receipt of cautionary warnings.

the delay, along with other relevant circumstances" are carefully considered. United States v. Cabral, 475 F.2d 715, 717 (1st Cir. 1973); Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In the instant case, the cause of this comparatively brief delay is unclear, although there is no contention that responsibility therefor must be laid to the government. The taxpayers were not incarcerated during this period, and the delay in no way hampered their ability to present their best possible defense. The taxpayers only assert that this delay occasioned them considerable anxiety and concern. Barker v. Wingo, *supra*, 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d 101. However, apart from this bald assertion, they have introduced no evidence to support such a contention, nor have they sought to describe precisely its nature and ramifications. *See* United States v. Churchill, 483 F.2d 268, 274 (1st Cir. 1973); United States v. Daley, 454 F.2d 505, 509 (1st Cir. 1972). Taking all these factors into consideration, we conclude that the taxpayers' sixth amendment claim must fail.

The final contention made by the taxpayers is that the counts of the indictment which allege violations of 26 U.S.C. § 7206(1) should have been dismissed for failure to charge an offense. The challenged counts alleged that by knowingly and substantially understating their "gross receipts," information as to which is specifically required by Schedule C of the Form 1040 tax return,[16] the taxpayers subscribed to a materially untrue and incorrect matter. They now assert that misrepresentations as to gross receipts would not constitute *material* misstatements. We disagree. *See* Siravo v. United States, *supra*.

Reversed and remanded for a new trial.

---

16. Virtually all the income received by the taxpayers during the years in question was derived from the operation of a sole proprietorship. Schedule C requires all such proprietorships to list their "gross receipts."

That amount is an integral and necessary figure in the computation of taxable income and the amount of tax due. *See* Siravo v. United States, *supra*, 377 F.2d at 472.