JOHN C. BARRIER AND LAVERNE BARRIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrier v. Commissioner
Docket No. 16949-79.
United States Tax Court
T.C. Memo 1983-258; 1983 Tax Ct. Memo LEXIS 533; 46 T.C.M. (CCH) 100; T.C.M. (RIA) 83258; May 9, 1983. Robert Kovacevich, for the petitioners. James A. Nelson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, *535 Judge: Respondent determined deficiencies in petitioners' joint Federal income tax and additions to tax under section 6653(b)[1] as follows: Year
Deficiency
Addition to Tax
1973
$ 63,812.85
$31,906.43
1974
$129,737.52
$64,868.76
1975
$ 61,626.62
$30,813.31
The following issues are for decision: I. Whether petitioners filed a fraudulent income tax return for each, or any, of the taxable years 1973, 1974, and 1975. The resolution of this issue for 1973 and 1974 will determine whether the notice of deficiency for those years was timely mailed under section 6501(c)(1) and, if so, whether additions to tax under section 6653(b) for those years may be applied. For 1975, it will determine the applicability of the section 6653(b) addition to tax. II. Whether respondent erred in the determination of the deficiency for 1975. That issue involves a number of subsidiary ones: A. Whether petitioner John C. Barrier's *536 purported transfer to his children of stock in a corporation, Corrugated Metals, Inc., a subchapter S corporation, had economic reality and was effective to relieve him of tax in 1975 on the income attributable to that stock. B. Whether petitioner John C. Barrier had income in 1975 in the form of excessive "reimbursements" for expenses that he allegedly paid on behalf of a corporation, Northern Steel, Inc. C. Whether deductions claimed for 1975 by Corrugated Metals, Inc., for wages paid to petitioners' son were reasonable in amount. D. Whether deductions claimed by Corrugated Metals, Inc., the subchapter S corporation, for expenses petitioner personally paid were reasonable in amount. In order to facilitate the disposition of the numerous issues, we shall first state our findings as to the general factual background and then combine our findings of fact and opinion with respect to each issue. The fraud issue requires separate consideration of numerous transactions in each year. Following the consideration of the fraud issue, we shall decide the several deficiency issues for 1975. General
Petitioners filed joint Federal income tax returns for 1973, 1974, and *537 1975 with the Ogden Service Center, Ogden, Utah. At the time their petition in this case was filed, petitioners were legal residents of Spokane, Washington. Petitioner John C. Barrier (hereinafter petitioner) was, during the relevant period, in the steel manufacturing and construction businesses. He gained his early experience in business by working "generally in construction and in the oil field at various types of jobs" as an employee. In 1961, at the age of 30, petitioner went into business for himself. During 1973, 1974, and 1975, petitioner carried on his business largely through two corporations, Corrugated Metals, Inc. (CMI) and Northern Steel Buildings, Inc. (Northern Steel). CMI was a subchapter S corporation engaged in the manufacture of metal building products. Northern Steel was a subchapter C corporation engaged in the manufacture of steel buildings and steel beams. Except for the purported transfer of CMI stock to their children, discussed below, petitioners were the sole shareholders of both CMI and Northern Steel during the period in question. During 1973 and 1974, petitioner also owned a sole proprietorship known as Northwest Metal Supply. Petitioner *538 achieved his success in business in spite of having received only a ninth-grade education. He has never received any training in accounting and he has little aptitude or liking for the recordkeeping associated with his business. Petitioner's books have always been kept by employees or outside accountants, who were often frustrated by petitioner's slipshod and incomplete records, and by his inability to distinguish between his personal assets and transactions and those of his corporations. His income tax returns for 1973 and 1975 were prepared by an accounting firm, Seidman & Seidman, and his 1974 return was prepared by Robert Hylton, a certified public accountant then working for him as an employee. Petitioner handled much of his business and that of CMI and Northern Steel literally from his hip pocket. He traveled extensively. Before leaving on a trip, he would withdraw large sums of currency from one or both of the corporations.He would then use the currency to cover business transacted while in travel status and to pay his own expenses and those of his employees who accompanied him. Upon returning to his office, he would often fail to account promptly for the transactions *539 in which he had engaged. The result was that the corporate records and his own records were almost always in a chaotic condition. When Richard Green became petitioner's accountant in April 1973, for example, the receipts and deposit books and journals were badly out of date. Over $50,000 worth of items were in suspense from the unfinished work of the previous accountant and remained to be placed in proper accounts. The supporting records were stacked in a storage room out of order. The year-end accounts payable needed to be recorded. Numerous adjusting entries needed to be made. Green served as petitioner's accountant from April 1973 until February 12, 1974 and was succeeded by Robert Hylton. Due to petitioner's slipshod recordkeeping, Hylton also had difficulty in bringing the books of the companies into balance. I. Statute of Limitations and Additions to Tax
Petitioners filed their joint Federal income tax return for 1973 on October 15, 1974. They filed their return for 1974 on April 15, 1975. The notice of deficiency for those years, as well as for 1975, the third year in question, was issued on September 12, 1979. *540 The period of limitations on assessment and collection of income taxes is generally 3 years. Sec. 6501(a). The period commences running when the tax return is actually or constructively filed. Therefore, the general 3-year period had already run with respect to petitioners' 1973 and 1974 taxable years when respondent mailed the statutory notice. [2]
The period of limitations is extended indefinitely if a "false or fraudulent return with the intent to evade tax" has been filed. Sec. 6501(c)(1). [3] Relying on this provision, respondent contends that petitioners' 1973 and 1974 taxable years are still open for assessment and collection. Respondent also contends that at least part of the underpayment of tax for all 3 years here in dispute was "due to fraud" within the meaning of section 6653(b)[4] and that the addition to tax provided by that section is applicable. *541 Fraud, within the meaning of section 6501(c)(1) as well as section 6653(b), is an intentional wrongdoing with the specific intent to evade a tax believed to be owed. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). The required intent may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Stone v. Commissioner,56 T.C. 213, at 224 (1971); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). Whether fraud exists with respect to an underpayment of tax is in the final analysis a question of fact, and the burden is on respondent to prove fraud by clear and convincing evidence. Sec. 7454(a); Stone v. Commissioner,supra at 220; Rule 142(b). The answer to the question of the existence of fraud must be determined from an examination of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent concedes that petitioner *542 Laverne Barrier is innocent of fraud; his determination that each of the returns in question was fraudulent relates solely to the conduct and intent of petitioner John Barrier. Because she is innocent of fraud, petitioner Laverne Barrier would not, therefore, be liable for the addition to tax under section 6653(b). If, however, petitioner John Barrier committed fraud in connection with the joint returns for 1973 and 1974, neither spouse is protected by the statute of limitations insofar as it affects the deficiencies. Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). Applying the foregoing principles, we shall resolve the fraud issue year by year, Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court. A. Fraud--1973
Respondent's determination that petitioner's return for 1973 was fraudulent was based on several transactions. 1. The Airport Deal. Petitioner's business required him to travel often to Alaska. While passing through the Anchorage airport on one occasion, petitioner noticed an uncompleted steel building located in a row of *543 hangars and warehouses. Petitioner made inquiries and learned that construction on the building had stopped when the airline company that had begun the project had run short of cash and become unable to make progress payments to the contractor. Petitioner became interested in purchasing the structure and completing its construction himself. To this end petitioner made a cash payment of $25,000 to "somebody who was connected with the airline company" who in return promised to use his best efforts to steer the sale of the building to petitioner. "Sometime later" petitioner learned that the airline company had entered receivership and that he had "lost the airport deal." The transaction was entered in CMI's books as an "investment in building, Anchorage" and was written off as a loss in 1973. CMI claimed an abandonment loss on its investment in the airport project in the amount of $25,000 in its Federal income tax return for the year ended February 28, 1973. This loss was, in turn, reflected in petitioner's individual return for 1973. Respondent disallowed the claimed deduction for lack of substantiation and alleged that claiming the deduction constituted fraud. Respondent *544 did not show that petitioner did not make the $25,000 payment or that CMI was not entitled to the claimed deduction. Rather, the argument in his brief on this issue concludes with the statement that "the Commissioner's determination that the $25,000 abandonment loss in the Alaska property should be disallowed for lack of substantiation, should be sustained." Petitioner's failure to substantiate the transaction with documentation does not carry respondent's burden of proving that claiming the deduction was fraudulent. As we view the evidence on the issue, it indicates that the payment in question was actually made. We conclude that respondent has not demonstrated by clear and convincing proof that the deduction was fraudulently claimed. [5]
*545 2. Bad Debt Expense. A bad debt expense totaling $2,807 and representing loans to three different individuals was claimed in the Federal income tax return of CMI for its taxable year ended February 28, 1973, and was, in turn, reflected in petitioner's personal return for 1973. Respondent has determined that the corporation was not entitled to this deduction because "it has not been established that these debts actually became worthless during the tax year." Petitioner now concedes that these items are not deductible as bad debts, but does not concede that the deductions were fraudulently claimed. Determining the year of worthlessness of bad debts involves subjective judgments; an error in making that judgment will not support a determination of fraud in the absence of clear evidence of bad faith. The trial record does not show what facts petitioner had before him as to the worthlessness of these debts when he claimed the disputed deduction. We must, therefore, conclude that respondent has not carried his burden of demonstrating by clear and convincing proof that the claiming of the deduction for this small amount constituted fraud. 3. Taff Seed Liquidation. Petitioner *546 owned one-third of the stock of a corporation named Taff Seed, Inc. (Taff Seed), which was liquidated in 1973. Petitioner's basis in his stock was $209,495.77. On liquidation, the other shareholders received Taff Seed's cash and petitioner received only an assignment of Taff Seed's rights under a contract of sale pursuant to which another corporation, named Seeds, Inc., had purchased from Taff Seed a processing plant located on leased land. In fact, in order to complete the liquidation, petitioner had to pay $55,000 or more into the corporation so that he would receive the contract. The face amount to be paid according to the terms of the contract was $227,500. Petitioner did not report the liquidation of Taff Seed in his tax return for 1973. Respondent, taking the face value of the contract that petitioner received as its fair market value, determined that petitioner realized a capital gain of $18,004.23 ($227,500 minus $209,495.77) on the liquidation.Respondent also alleged in his answer that petitioner's failure to report the transaction constituted fraud. We do not think that respondent has proved that the failure to report the transaction was fraudulent. Whether petitioner *547 realized gain on the transaction depends on the value of what petitioner received for his stock--the fair market value of the $227,500 contract with Seeds, Inc. The record does not establish that petitioner knew that he realized gain on the transaction. Indeed, the only formal valuation of the contract in evidence is the testimony and report of an expert which indicate that the contract had a value of $156,292 and that petitioner actually realized a loss on the transaction. Accordingly, respondent has failed to prove that petitioner's failure to report the liquidation was fraudulent. 4. Taff Seed--Interest. Petitioner's in-house accountant prepared Forms 1099 in connection with the liquidation of Taff Seed which indicated that petitioner realized interest income for 1973 in the amount of $8,125.71 as the result of a loan that he had made to the company. The Form 1099 was placed by the accountant in a file at the office of Northern Steel and the accountant left petitioner's employment before petitioner's 1973 return was filed. The interest income was not reported by petitioner in his income tax return for 1973, and respondent has determined that the omission was fraudulent.
*548 We find it significant that, as the parties have stipulated, petitioner actually overstated his total interest income by more than $17,000 for each of the years in question. Respondent has failed to prove that the omission of this particular item of interest income was due to fraud, rather than to the failure of the accountant who prepared petitioner's 1973 return, filed in October 1974, to locate the Taff Seed liquidation papers at that time. 5. Sale of Metal Press. In September 1971, petitioner purchased a metal press at auction for $8,881. He sold the press in March 1973 for $13,250. Petitioner did not report any gain from the sale in his tax return for 1973, and respondent has determined that the omission was fraudulent. Petitioner's explanation is that the metal press was confused with another piece of equipment which had cost $13,000. At the time that he filed his return, he thought that the $13,000 metal press had been sold. Because he thought there was no gain on the sale, he did not report the transaction. In the light of the facts of record, petitioner realized a gain on the sale. We are not convinced, however, that his failure to report the sale was due *549 to fraudulent intent. B. Fraud--1974
Respondent's determination that petitioner is liable for the addition to tax for fraud with respect to 1974 is based on the following transactions. 1. Bad Debt Deduction.
(a) Embezzlement Loss. Sometime in 1973 or 1974, petitioner's accountant discovered that one of petitioner's employees had been embezzling funds from him. The accountant believed that the amount embezzled was about $2,000 to $3,000. The employee admitted that he had embezzled funds but was unable to state with certainty how much he had embezzled. When he admitted the embezzlements, he had a "feeling" that the amount was "around $2,000, something in that neighborhood." The employee was aware that the proceeds of his embezzlement constituted gross income to him, and he reported $3,000 of income from this source in his tax return. [6]
After confronting the employee with the facts of the embezzlement, petitioner learned that the employee was unable to repay the money that he had stolen. Petitioner then asked the employee to sign a note stating that he owed petitioner $7,000; *550 petitioner told the employee that his reason for wanting the note "had something to do with his taxes." The employee refused to comply with this request; he did not believe that he had taken that much money. In his tax return for 1974, petitioner claimed a deduction in the amount of $5,000 for the debt resulting from the embezzlement. Respondent determined and now argues that the deduction was fraudulently claimed on the ground that petitioner knowingly claimed a larger deduction than he was entitled to. Respondent has failed, however, to carry his burden of proving that petitioner's actual loss was less than $5,000. It is clear that the employee embezzled some money from petitioner. According to petitioner, a polygraph examination of the employee indicated that the employee had taken "somewhere around $5,000 to $7,000." The actual amount embezzled was indefinite when petitioner claimed the deduction and remains so even now. No audit report establishing the exact amount of the loss was introduced in evidence, and there is no evidence that any such audit was made. The embezzler himself does not know how much he stole. In his testimony he estimated that the amount was "around *551 $2,000"; in his tax return for the year of the theft he reported $3,000 of income from that source. That petitioner asked the embezzler to sign a note in excess of the amount the embezzler acknowledged does not, standing alone, show that petitioner was trying to document an excessive deduction. In the light of all the evidence, we do not think that petitioner's use of $5,000 as his estimate of the amount of the loss has been shown to be fraudulent. [7]
(b) Other Bad Debts. In addition to the bad debt deduction claimed with respect to the embezzlement, petitioner also claimed other bad debts totaling about $16,000 in 1974. Respondent initially disallowed all of these deductions and, in addition, determined that they had been fraudulently claimed. We do not agree that the deductions constituted fraud. The record establishes that petitioner often loaned *552 money both to employees and to outsiders and, as noted above, decisions as to when and whether debts have become worthless involve to some extent subjective judgments. Although documentary evidence of some of the underlying debts is lacking, respondent has failed to prove fraud with respect to this item. 2. Fire Loss.
In his tax return for 1974, petitioner claimed a loss in the amount of $14,000 for a "building and equipment" that were damaged by fire during that year on his Spokane premises. The records of the Spokane Fire Department do not contain a report of a fire occurring on petitioner's premises during that year, although they do contain reports of fires in 1970 and 1975. Respondent contends that petitioner suffered no fire loss in 1974 and argues that claiming the deduction was fraud. Petitioner, however, has testified that at least two fires did, in fact, occur in 1974, even though he was not able to pinpoint the dates; he also suggested that an insurance claim for a fire loss in a prior year may not have been resolved until 1974. [8] Apart from the local fire department records, the correctness of which petitioner challenges (with testimony that a representative *553 of the fire department had informed petitioner's counsel that only records of fires causing total losses of property were kept), there is no evidence to show that petitioner did not suffer a fire loss. Also there is no evidence to refute petitioner's suggestion that if the fires did not occur in 1974, the claimed deduction may have reflected an unfavorable termination of an insurance claim based on an earlier fire. Although this issue is a close one, we hold that respondent has failed to carry his burden of proving fraud with respect to it. 3. Demolition Loss and Theft Loss.
In his tax return for 1974, petitioner claimed a deduction under section 165 in the amount of $20,000 for the "demolition" by vandals of a "metal shear and press" and a deduction in the amount of $10,000 for a "metal press" which had been "stolen." Respondent determined that these deductions were fraudulent, based on his conclusion that the alleged acts of vandalism and theft never *554 occurred. We are convinced, however, based upon the record as a whole, that petitioner did suffer losses through vandalism and theft during 1974. [9] Petitioner introduced a police report on an investigation made on March 21, 1974, which quotes a representative of CMI to the effect that "they had lost over $40,000 worth of items from the area in the recent past." Petitioner also testified as to vandalism. We find that respondent has failed to carry his burden of proving that these deductions were fraudulent.In his reply brief, respondent implicitly recognizes that petitioner suffered losses but argues that the evidence "does not indicate that vandalism was the sole cause of the damage" and that the "presses had scrap value." We recognize that respondent's determination in this respect requires him for purposes of fraud to prove a negative, never an easy task.This is a difficulty which is inherent, however, in basing a fraud determination on such an item. *555 4. Double Deduction.
In early 1972, petitioner acquired three adjoining buildings located on Division Street in Spokane and known as the Garrett property at a cost of approximately $90,000. The buildings housed a restaurant, a tavern, and a law office. The cost was allocated on an amended 1972 return as $60,000 for the buildings and $30,000 for the land. The restaurant was torn down in 1974, leaving the tavern and law office standing, and a loss for the demolition was claimed in petitioner's tax return for fiscal year 1974. Petitioner continued to claim depreciation on the demolished restaurant for 1975, however, resulting in a double deduction--a deduction for the abandonment followed by a deduction for depreciation.
Respondent argues that the claiming of this double deduction constituted fraud. The record shows, however, that the double deduction was the result of confusion caused by different terms being used by different accountants to describe the property, in what one of the accountants termed a "comedy of errors." The head of the tax department for the accounting firm that prepared petitioner's returns for 1973 and 1975 explained the error on the ground "there *556 was a different accountant in each year and one was not familiar with the terminology of the other." Although petitioner's frequent changes of accountants no doubt greatly increased the chance of such an error, respondent has not proved that this mistake was made with an intent to defraud. 5. Sale of Library Building.
During fiscal 1974, Northern Steel constructed a library building for the Boundary County Free Library Association in Boundary County, Idaho. Petitioner and the Library Association agreed that petitioner would handle the financing for the building. In carrying out that agreement, petitioner purchased the building from Northern Steel and sold it to the Library Association for $114,506. The parties are in dispute as to petitioner's cost basis in the building. Petitioner claims that it had a basis of $85,050 and, accordingly, that he realized a gain of $26,456 on the sale. Respondent has determined, however, that petitioner's basis was only $66,000, and that his realized gain was $48,506. Respondent's determination is based on records of Northern Steel which indicate that petitioner's capital account was charged in the amount of $66,000 when the building *557 was transferred to him. Petitioner's claim of a higher basis is based on cash expenditures he made personally with respect to the property. Robert Hylton, a certified public accountant who prepared petitioner's 1974 income tax return, testified that petitioner incurred costs in excess of the amounts shown on Northern Steel's books, that he helped petitioner arrive at the basis stated in the return, and that he was satisfied that such basis represented "real costs." There is no evidence to the contrary. We conclude that the evidence is not so clear and convincing as to provide support for a finding of fraud with respect to this item. 6. Unidentified Bank Deposits--1973 and 1974.
Based on an analysis of petitioner's bank deposits, respondent determined that petitioner had unreported income in 1973 in the amount of $28,889.20 and in 1974 in the amount of $67,040.29. [10] Respondent now concedes that petitioner has shown that $10,000 of the 1973 deposits and $21,524.63 of the 1974 deposits were attributable to nontaxable sources. Respondent maintains, however, that the source of the remainder of the deposits, amounting to $18,889.20 in 1973 and to $45,515.66 in 1974, is still *558 unindentified, and that those unidentified amounts represent income unreported by petitioner. The bank deposits method of reconstructing income has been described as follows: Basically, * * * this involves the estimation of the gross receipts of a business by ascertaining the bank deposits made during the tax year, together with any other income shown to have been received but not placed in bank. To the total thus shown it is necessary to make numerous deductions and adjustments, such as, or example, eliminating amounts deposited as the proceeds of bank loans, amounts transferred from one bank account to another, any amounts received as gifts, and other adjustments of a similar sort, thereby determining *559 the gross business receipts. From the amount thus found there is deducted all proper business expenses in order to arrive at the adjusted gross income. This, in turn, is subject to deduction for such items as contributions, interest paid, taxes, medical expenses, etc. The result, after allowance for the exemptions for the taxpayer and his dependents, represents the taxable income. Morrison v. United States,270 F.2d 1, 2-3 (4th Cir. 1959). [11] The method is, therefore, primarily a means of determining the total gross receipts of a business. It has, however, also been used, as by respondent in the present case, to determine not total receipts, but specific items of unreported income. Estate of Hague v. Commissioner,45 B.T.A. 104 (1941), affd. 132 F.2d 775 (2d Cir. 1943); Prizep v. Commissioner,T.C. Memo. 1959-56.
*560 Petitioner argues that respondent "did not produce any admissible evidence" with respect to this issue, citing United States v. Morse,491 F.2d 149, 152-153 (1st Cir. 1974). In that case, in which the taxpayer's criminal conviction for income tax evasion was reversed and remanded for a new trial, the court considered the admissibility of the testimony, heard by the trial court, of the revenue agent who had performed the bank deposits computation with regard to his finding as to nonincome deposits. The agent had "indicated in some detail" how he had determined which deposits did not represent income, but the underlying bank records, although apparently available, were not introduced into evidence. The court held that the agent's testimony on this point, "unsupported by independent documentation and corroboration," constituted inadmissible hearsay. The court stated that (491 F.2d at 154) -- the agent does have an overall burden to prove that he has done the best he can to discover, and exclude, all non-income items from the reconstructed income.Where direct evidence is available as to their existence and magnitude, there is no need to rely on the *561 agent's hearsay assertion that they were no larger than he had accounted for. [Fn. ref. omitted.] The court noted, however, that (491 F.2d at 154, fn. 8): To be sure, the court must rely on mere assertion when the agent testifies that he could find no evidence of other non-income items, but then, of course, no better evidence would exist. In the present case, the bank records upon which respondent's computation of petitioner's bank deposits was based were not introduced into evidence. Petitioner, however, while faulting respondent for failing to produce "better evidence" than the agent's testimony, does not dispute that the deposits computed by respondent were actually made in the amounts asserted, nor does he allege that respondent possessed "direct evidence" which might have indicated that the amount of the nonincome deposits was greater than respondent determined or has now conceded.Respondent's agent did as much as possible, based on the information available to him at the time, to eliminate nonincome items from his computation. Accordingly, his testimony was admissible. We are convinced, however, based upon additional information which petitioner was *562 able to supply at trial about the source of the funds deposited, that much of the total amount determined to be income by respondent actually represented receipts from nontaxable sources, such as loan repayments. Moreover, even if it be assumed that bank deposits not shown to have been derived from nontaxable sources were prima facie income, we cannot ignore the uncertainty as to whether the unexplained deposits were part of the reported income. The uncertainty is highlighted by respondent's last minute concessions of substantial portions of the deposits for each year. Taking into account the ever-present potential for errors in the use of the bank deposits method of income reconstruction, we do not think the unexplained deposits have been so clearly shown to be income as to permit us to accept them as a basis for finding fraud. 7. Uncooperativeness with Accountant During 1974.
Richard Green was CMI's accountant and financial controller from April 1973 until February 1974. He was the company's first in-house accountant, and its records were in disorder when he began. His task of organizing the company's books and bringing them up to date was complicated by his poor working *563 relationship with petitioner. Green often found petitioner unable or unwilling to supply some of the information necessary to account for petitioner's activities. Respondent, however, has not proven his assertion that petitioner's uncooperativeness with his accountant is evidence that petitioner attempted to evade the payment of taxes for any one of the 3 years here in issue. From the testimony of petitioner, Green, and other witnesses, it is clear that Green was a precise recordkeeper while petitioner wanted to paint everything with a broad, sloppy brush, looking only to the final product. These differences, we infer, produced personality clashes which ultimately led to Green's discharge. Green did not prepare the tax returns for any one of the 3 years in dispute. The 1973 returns were prepared after Green began working for petitioner but bythe accounting firm of Seidman & Seidman. The 1974 returns were prepared by Robert Hylton several months after Green left petitioner's employment. We think it would be error to infer from the troubled relationship of petitioner and Green that petitioner sought to cheat the Government of taxes that he knew to be owing. C. Fraud--1975
*564 In the answer in which fraud was alleged, the only allegedly fraudulent income or adjustment items for 1975 were as follows: False wage claims
$2,353.75
Insurance reimbursement
$1,243.01
At the trial, respondent conceded the $1,243.01 item, leaving only the wage claims issue as a ground for fraud specifically related to 1975. 1. Wage Claims.
The allegedly false wage claims involved payments by CMI to John Barrier, Jr. (J.J.), son of petitioner. J.J. was born on September 5, 1956, and at an early age he began working part-time and during some periods full-time for his father. He was graduated from high school in June 1974 and thereafter worked for CMI or Northern Steel full-time. CMI issued the following checks to J.J. during its fiscal year ended February 28, 1975, and charged them to the wages account: Check No.
Date
Amount
3097
March 15, 1974
$1,412.75
3172
April 12, 1974
$470.75
3325
May 14, 1974
$470.75
Respondent disallowed the wage deduction taken for these amounts and cited them in his answer as support for his fraud determination. Both petitioner and J.J. testified that J.J. worked for CMI and Northern *565 Steel after school and on weekends during this period and that he performed valuable services. Their testimony was confirmed by two employees, Robert Hylton and Jack Cargo. It is true that Green testified that he could not remember that J.J. worked at the plant very much, but Green was fired on February 12, 1974, and would not, therefore, have known whether J.J. worked during March, April, and May 1974, when the checks were issued.
Section 162(a) allows a deduction for "reasonable compensation" paid to employees. As discussed below, we do not think the compensation paid to J.J. was reasonable in amount. Determining what is reasonable compensation, however, involves large elements of subjective judgment, and we do not think that the evidence is sufficient to show that petitioner caused CMI to pay these sums to J.J. in order to evade or defeat the payment of tax. D. Conduct Subsequent to Years in Question
In december 1976, subsequent to the years in question, petitioner hired a hoodlum to beat up one of petitioner's former employees because petitioner thought the former employee *566 was cooperating with an Internal Revenue Service investigation of him. In March 1977, the hoodlum beat the employee severely, telling him that the reason for the beating was that he "had cost somebody he knew a lot of money." The hoodlum was later convicted of assault, was sentenced to prison, and served 32 months. [12]
Respondent argues that: "Attempting to silence an individual involved as a witness in a federal tax investigation is a clear indication of fraud on the part of the perpetrator." In a proper case, the subsequent conduct of a taxpayer, such as failure to cooperate in an investigation, is some evidence that he did, in fact, intended fraud when the return was filed. Estate of Granat v. Commissioner,298 F.2d 397, 398 (2d Cir. 1962). In order to show that a tax *567 return was fraudulent, however, the fraudulent intent must exist at the time the return was filed. Gleis v. Commissioner,24 T.C. 941, 952 (1955), affd. 245 F.2d 237 (6th Cir. 1957). "Subsequent conduct of the taxpayer * * * even though reprehensible, will not justify the imposition of the penalty, unless the fraudulent intent is shown to have existed when the return was made." Semple v. Commissioner, a Memorandum Opinion of this Court dated August 28, 1951. Petitioner's resort to violence is reprehensible, and criminal statutes provide for its punishment. It is not, however, without more, clear and convincing evidence that petitioner knowingly attempted at the time he filed his return to evade or defeat a tax believed to be owing for any of the years before the Court. E. Conclusions as to Fraud--1973, 1974, and 1975
We have found this case an extremely frustrating one. We have analyzed above, one by one, the grounds cited by respondent in his answer to support his fraud determination for each year. Numerous other issues were tried. [13] The parties placed so many issues in controversy that neither one of them was able to investigate *568 and to make a reasonably complete trial record on the many individual items. We must conclude that the evidence as to any one adjustment or as to all adjustments will not support a finding of fraud. Had the burden of proof with respect to the fraud items rested with petitioner to show that he did not have the disputed income or that he was entitled to the disputed deductions, the decision as to most of them might have gone for respondent. Had respondent's agents concentrated on a few major issues and developed the facts fully, the evidence might have confirmed the suspicion of fraud created by the host of apparent errors in petitioner's returns. The burden of proof as to fraud rested with respondent, however, and we are compelled to hold that his proof was insufficient. A close examination of respondent's brief suggests that he at least *569 implicitly recognized this to be the situation because he argued with respect to many of the issues that petitioner had not substantiated his position. Petitioner's failure to substantiate his treatment of the disputed items is not clear and convincing evidence of fraud. We are concerned that our conclusion may appear to reward petitioner for maintaining inadequate records on his business transactions. If the evidence had permitted an inference that his records were deliberately confused and purposely made incomplete, that would have been evidence of fraud. Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957); Galant v. Commissioner,26 T.C. 354, 365 (1956). Viewed objectively, however, the trial record indicates that petitioner retained most of the original documentation (bills, invoices, checks, etc.) for his transactions, although many of the papers on those transactions were not properly organized and recorded in journals and ledgers. The evidence as to how petitioner kept records shows gross negligence but we have concluded that it will not sustain a finding of fraud. Our conclusion on the fraud issue, also, should not be *570 interpreted as an endorsement of some of petitioner's activities or suspected activities. He is hardly entitled to a Good Citizen of the Year Award. In this connection, we refer especially to his hiring a hoodlum to silence a former employee suspected of supplying information to the Internal Revenue Service. Nonetheless, the fraud issue must be decided in the light of the evidence of record. We cannot base a finding of fraud on suspicion, speculation, or failure of proof. The evidence does not clearly and convincingly show that petitioner's 1973 and 1974 returns were fraudulent within the meaning of section 6501(c)(1) or that any part of the 1975 understatement of tax was due to fraud within the meaning of section 6653(b). Accordingly, the assessment of deficiencies for 1973 and 1974 is barred by limitations, and the section 6653(b) addition to tax for 1975 does not apply. II. Deficiency for 1975
The deficiency for 1975 was determined by making the following adjustments: (a) Increase in income from CMI: Purported transfer of stock to children
$25,612.00
Unallowable deduction of compensation
to John C. Barrier, Jr.
2,353.75
Unigard Insurance adjustment
1,243.01
Unsubstantiated expenses
9,631.99
Total
$38,840.75
(b) Income from Northern Steel
$22,683.83
(c) Depreciation of helicopter
$13,919.19
*571 As indicated above, respondent conceded at trial the $1,243.01 Unigard Insurance adjustment issue, and the parties stipulated that the helicopter had a basis of $201,000. A. Purported Transfer of CMI Stock
During 1973 and 1974, petitioner was the sole shareholder of CMI. The corporation's taxable year was the fiscal year ending February 28. Petitioner purportedly transferred 30 percent of the stock of CMI to his children, J.J. and Michelle, on February 20, 1975. At the time of the purported transfer, J.J. was 18 years old and Michelle was 7 years of age. In accordance with the purported transfer, $25,612 of the undistributed taxable income of CMI for its taxable year ended February 28, 1975, was allocated to J.J. and Michelle in CMI's tax return and was taken into account by them in their personal returns for 1975. Respondent determined that: The purported transfers of stock by Mr. Barrier to his two minor children, John Barrier, Jr. and Michael Joni Barrier, had no economic reality, and John C. Barrier, Sr., was the true economic owner of all the stock. Accordingly, respondent reallocated $25,612 of CMI's undistributed taxable income back to petitioner. *572 A donee or purchaser of stock of a subchapter S corporation is not considered a shareholder unless he is the "real owner" of such stock; "[t]ransactions between members of a family will be closely scrutinized." Sec. 1.1373-1(a)(2), Income Tax Regs. Here, neither of the children participated in the management of the corporation during the years in question. They were obviously too immature to do so.No effort was made to comply with the Washington Uniform Gift to Minors Act, Wash. Rev. Code sec. 21.24.020, by registering the stock in the name of a custodian. While petitioner and J.J. testified regarding trust accounts set up for the children, the record contains no evidence indicating that anyone on behalf of the children voted their shares or received an actual distribution of any of CMI's income during those years or in any subsequent year. The record does not reveal where the certificates representing the children's interests in the company were kept. They were lost sometime prior to the trial of this case. Considering the evidence before us, we must conclude that, although many of the forms *573 of an actual stock transfer were followed, petitioner has failed to establish that the purported transfers to his children had economic substance, as the burden was on him to do. Duarte v. Commissioner,44 T.C. 193, 197 (1965). We hold, therefore, that petitioner was, in substance, the owner of all of the stock of CMI during the period in question, and that all of the income attributable to that corporation is taxable to him. See Duarte v. Commissioner,supra, in which the same conclusion was reached on similar facts. It is, accordingly, unnecessary that we consider respondent's alternative argument that the income should be reallocated to petitioner under the provisions of section 1375(c).[14]
*574 B. Income--Northern Steel Inc.
Petitioner sometimes purchased equipment for CMI or Northern Steel at auctions. He also sometimes paid corporate expenses while working on various jobs with his crews. Checks were issued to petitioner by the companies in order to reimburse him or advance him the money for the expenses so incurred. Respondent has determined that, with respect to 1975, petitioner received $22,682.83 from Northern Steel in excess of the funds expended by him on behalf of that company. Respondent has determined that petitioner must recognize additional income in that amount. [15]
*575 The record does not reveal the exact procedure respondent followed in determining what items constituted income, but petitioner received large gross amounts, from which respondent has allowed some deductions for amounts conceded to represent reimbursements or advances for corporate expenses incurred. The amounts determined to constitute income are, therefore, net figures. Petitioner introduced notebooks into evidence containing notations of some of his business expenses. The notebooks indicated total expenses of $24,747 for 1975. The notebooks do not indicate, however, which ones of the expenses are allocable to Northern Steel and which ones are allocable to petitioner's other businesses, nor does the record reveal the extent to which these expenses have already been taken into account by respondent in determining the amount by which "reimbursements" exceeded the expenses actually incurred. As a result, we are unable to find that petitioner is entitled to credit for any additional expenses. We hold for respondent on this issue. C. Wages Paid to John C. Barrier, Jr.
In connection with the discussion of fraud for 1975, we have made findings of fact with respect to *576 the wages of $2,353.75 paid by CMI to J.J. in 1975. We there concluded that CMI's deduction of those amounts was not fraudulent. Section 162(a) allows a deduction for only a "reasonable" amount of salaries or other compensation. While CMI's claiming the $2,353.75 was not, for the reasons stated above, fraudulent, we do not think the amount paid was "reasonable" compensation. The payment of $2,353.75 purportedly represented compensation for services for his last 3 months of high school attendance. Discounting considerably some of the testimony as to the amount and value of his services, we find that he worked 10 hours per week for 12 weeks during this period and earned $3.50 per hour, for a total amount of $420. D. CMI Deductions
In its Federal income tax return for the year ended February 28, 1975, CMI claimed deductions in the amount of $9,631.99. This amount represented expenses of the company which petitioner had purportedly paid. On CMI's books, the amounts were treated as loans or advances by petitioner to the company. Respondent determined that the claimed deductions were not allowable, based on his conclusion that "it has not been established that these were *577 ordinary and necessary business expenses or were expended for the purpose designated." Respondent increased the undistributed taxable income of CMI correspondingly and charged this increase to petitioner under section 1373. Petitioner has introduced no evidence which identifies the items for which the amounts in question were purportedly expended, nor has he provided any substantiation for any of the payments. Accordingly, we hold for respondent on this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All Rules references are to the Tax Court Rules of practice and procedure unless otherwise noted.↩
2. There is no question of the timeliness of the statutory notice with respect to petitioners' tax return for 1975, which was filed on Sept. 15, 1976.↩
3. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessd, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
4. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
5. The testimony of one witness suggests that the payment was made to a bankruptcy trustee or referee; other testimony indicates that the payment was made to someone connected with the airline company. The conclusion we have reached would be unchanged even if respondent had based his determination of fraud on the additional ground that the payment, even if actually made, was illegal. Although some of the testimony indicates that the payment in some respects "smacks of a bribe", the record will not support its characterization as such. There is no credible evidence that the payment was, in fact, made to a public official. Respondent has cited no Federal or State law that the payment violated. Sec. 162(c)↩.
6. The record does not reveal how the income was described in the return.↩
7. Respondent places much emphasis on petitioner's statement to the employee that his reason for wanting the employee to sign a note "had something to do with his taxes." We do not find this statement determinative, however. A taxpayer need not intend fraud merely because he seeks documentary support for his deductions.↩
8. According to the testimony, one of the fires may have occurred in a year prior to 1974, the deduction being claimed in 1974 because it was in that year that it became certain that no insurance proceeds would be paid.↩
9. There was no evidence concerning any metal press which had been "stolen," but the record does establish that several presses were rendered inoperative by vandals. The tax effect is the same whether the loss was caused by vandalism or by theft, and, on these facts, the misdescription of the event giving rise to the deduction does not constitute fraud.↩
10. The total was composed of the following individual deposits: ↩
1973
Mar. 12, 1973
$ 6,030.80
Mar. 23, 1973
$ 3,935.16
Apr. 4, 1973
$10,000.00
May 11, 1973
$ 5,648.24
July 9, 1973
$ 4,275.00
$28,889.20
1974
Apr. 15, 1974
$ 90.25
Apr. 18, 1974
175.00
Sept. 30, 1974
8,546.82
Nov. 1, 1974
14,132.95
Nov. 27, 1974
36,099.27
Dec. 4, 1974
7,694.00
Dec. 5, 1974
100.00
Dec. 6, 1974
152.00
Dec. 9, 1974
50.00
$67,040.29
11. The method is often inexact, and the difficulties inherent in its use are well illustrated by the present case. Respondent's agent, in making his computation, was often forced to work from bank records which provided the amount of a deposit, but no information, or incomplete information, as to its source. As we have noted, petitioner's own records were bad even under the best of circumstances, and they were of little help in identifying transactions several years in the past.↩
12. Although no testimony was offered on the subject, one of petitioner's pretrial motions states in part that "Petitioner, John C. Barrier, for extenuating reasons, pled guilty to a violation of 18 U.S.C. 1510↩," which makes obstruction of criminal investigations a crime.
13. These issues involved other adjustments which produced the deficiencies determined for 1973 and 1974 but were not based on transactions alleged by respondent to be fraudulent. We have not discussed the other adjustments because we have found that the assessment of deficiencies for 1973 and 1974 is barred by the statute of limitations.↩
14. Although respondent's answer alleging fraud for 1975 did not mention this adjustment, respondent cites it on brief in contending that the sec. 6653(b)↩ addition to tax should apply for that year. This interfamily transfer, however, is not materially different from many others that have been disallowed by the courts without any finding of fraud.We do not think it has been shown that this transfer was so devoid of economic reality as to prove that fraud was committed.
15. Respondent has not attempted to characterize this income, but presumably his theory is that the payments were either dividends paid to petitioner in his capacity as a shareholder, or additional compensation paid to him as an employee. The record does not reveal the balance in Northern Steel's earnings and profits account at the time the payments were made, but petitioner, although he addresses the constructive dividend issue on brief, does not assert that the corporation had insufficient earnings and profits for the payments to constitute dividends. It is unnecessary for us to categorize the income because, whether it is a dividend or compensation for services, the effect as to petitioner will be the same.↩