DINO BENCIVENGA AND MARY ANN BENCIVENGA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bencivenga v. Commissioner
Docket No. 29195-86.
United States Tax Court
T.C. Memo 1989-239; 1989 Tax Ct. Memo LEXIS 239; 57 T.C.M. (CCH) 424; T.C.M. (RIA) 89239; May 16, 1989
Edward J. Fletcher and Stephen A. FitzPatrick, for the petitioners. Timothy S. Murphy, for the respondent. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: In a notice of deficiency dated April 15, 1986, respondent determined a deficiency of $ 20,573.10 in petitioners' Federal income tax for 1979 and an addition to tax of $ 10,286.55 pursuant to section 6653(b). [1] The issues for decision are: (1) Whether petitioner received unreported taxable income during the year in issue in the amounts determined by respondent; (2) whether any part of any resulting underpayment of tax was due to fraud, thereby subjecting petitioners to liability for the addition to tax imposed by section 6653(b); (3) whether petitioners are entitled to business expense deductions in excess of those allowed by respondent; (4) whether petitioners failed to report interest income of $ 250.31; and (5) whether the assessment of the tax is barred by the statute of limitations. [2]
*241 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Dino Bencivenga (hereinafter petitioner) and Mary Ann Bencivenga are husband and wife who resided in Beverely Hills, Michigan at the time they filed their petition in this case. Petitioners timely filed a joint Federal income tax return for the 1979 taxable year with the Central Service Center, Covington, Kentucky. They maintained their records and filed this return using the cash basis method of accounting. During 1979, petitioner, doing business as the Dino Bencivenga Insurance Agency (hereinafter Agency), sold insurance products and reported income and expenses on his Form 1040, Schedule C. He offered his clients a variety of policies underwritten by a number of insurance carriers and earned commission income on the sale and renewal of these policies. His commission income varied between 2.5 percent and 25 percent of the gross premium charged depending on the type of policy and the insurance carrier. Petitioner also offered his clients a number of investment and insurance products on which he *242 did not earn a commission. At the time of trial, petitioner had been in the insurance business for 34 years. The Agency's income was derived from commissions paid under two methods of billing. Under the direct billing method, the insurance carriers bill petitioner's clients for premiums due. Following receipt of the premium payment from the insured, the insurance carrier remits a check to the Agency in payment of the commission earned on the sale or renewal of the policy. Under the agency billing method, the Agency receives the premium payments directly from the insureds and, after deducting its commission, remits the balance of the premium payment to the appropriate insurance carrier. During the year in issue, the majority of commissions were earned through the agency billing method. Petitioner maintained a cash journal in which premium payments collected under the agency billing method were recorded by date received, amount, and source. Commission checks received under the direct billing method were also recorded in the cash journal. The receipts were totalled by either petitioner or Janelle Bradley, petitioner's secretary, and a deposit ticket was prepared. The collected *243 items were then deposited in the "agency" account, one of two business checking accounts maintained by the Agency. The cash journal contains approximately 2,450 separate entries. Most of the entries reflect receipts in amounts of less than $ 300. The vast majority of these receipts are in odd dollar amounts and appear to represent payments for insurance premiums. The relatively few deposits exceeding $ 300 are recorded in the cash journal as received from sources that appear to be business clients, such as construction companies and pizza parlors, and most of these receipts are also in odd dollar amounts. With the exception of $ 208 received by the Agency on August 20, 1979, all the amounts recorded in the cash journal were deposited in the "agency" account during the year in issue and the amounts listed on the deposit tickets for 1979 matched the amounts recorded in the cash journal. A deposit of $ 4,735 made to the "agency" account on June 19, 1979, however, is not reflected in the cash journal. The amounts deposited in the "agency" account included "commissionable receipts" and "noncommissionable receipts." Commissionable receipts included all payments made to the Agency *244 on which petitioner earned a commission. Noncommissionable receipts included amounts the Agency received from clients purchasing certain insurance policies and investment products on which petitioner did not earn a commission. Noncommissionable receipts also consisted of premiums mistakenly mailed to the Agency, rather than directly to the insurance carrier, and payments received from clients who mistakenly believed a payment was due. These payments were deposited in the "agency" account and were subsequently redirected, either to the appropriate insurance carrier or back to the insured. Petitioner testified that he calculated the Agency's commissions in the following manner. Petitioner first reviewed each deposit made to the "agency" account and identified the commissionable items received pursuant to the agency billing method. Petitioner would then calculate commission income by applying the appropriate commission percentage to each gross premium payment. These amounts, together with commission income earned under the direct billing method, were then transferred from the "agency" account to the "payroll" account. These calculations of commission income and the corresponding *245 deposits to the "payroll" account were made either daily or every few days depending upon the amounts received by the Agency. Under this method of accounting, total yearly deposits into the "payroll" account should represent the gross commissions earned by the Agency. During 1979, all amounts deposited in the "payroll" account were transferred from the "agency" account. The "payroll" account bank statements report that 156 deposits were made during 1979. Of these deposits, only 2 were in odd dollar amounts. The remaining deposits were all in even dollar amounts, in multiples of $ 100, and ranged between $ 200 and $ 2,600. [3] At no time during 1979 were funds ever transferred back to the "agency" account from the "payroll" account. During the year in issue, petitioner transferred $ 96,116.91 from the "agency" account to the "payroll" account and reported this figure as gross receipts on line 1a of his 1979 Schedule C. On line 1b of that same return petitioner reported $ 6,703.82 as returns *246 and allowances. This figure purportedly represents amounts paid to insurance companies by the Agency on behalf of insureds who subsequently failed to reimburse the Agency. Petitioner provided his accountant with this figure. When petitioner received premiums under the agency billing method he paid the net amount of the premiums due to insurance carriers by writing checks against the "agency" account. Petitioner also disbursed amounts received as noncommissionable receipts by writing checks on the "agency" account. Most, if not all, noncommissionable receipts received during 1979 were disbursed during the same year. Under petitioner's method of accounting, he did not report noncommissionable items or any portion of premiums payable to insurance carriers under the agency billing method as gross receipts. Disbursements from the "agency" account for premiums or noncommissionable items were not taken as deductions on petitioner's 1979 return. Petitioner maintained a binder to record accounts receivable. When payment was received from a client, an appropriate notation was made in the ledger. When the account was fully paid, the account page was transferred from the accounts receivable *247 binder to the paid account. These receipts were stored for a number of years and then destroyed. The accounts receivable records for 1979 no longer exist. As part of his accounting system, petitioner used a cash disbursement journal on a safeguard business system form to record commission income deposited to the "payroll" account and Agency expenses paid out of that account. This is a check writing system that provides the user with a carbon copy of each check written on the "payroll" account. The disbursement journal also contains a columnar sheet that enables the user to record deposits and withdrawals, maintain a running balance, and record each check under an expense heading. Using this system, petitioner created monthly check registers reflecting the Agency's expenses and commission income passing through the "payroll" account. The monthly check registers were delivered to Marco Soave, petitioner's accountant and return preparer. Mr. Soave also received the bank statements for both the "agency" and "payroll" accounts directly from the bank. Using the monthly check registers prepared by petitioner, Mr. Soave compiled a check register summary of the "payroll" account. *248 This document summarizes the Agency's expenses for each month, provides a column to total the expenses for the year, and lists the monthly deposits of commission income transferred from the "agency" account. To calculate the Agency's gross receipts, Mr. Soave totalled the deposits made to the "payroll" account during the year. As previously discussed, it was petitioner who calculated the amounts of commission income transferred from the "agency" account to the "payroll" account. Petitioner never asked Mr. Soave to independently verify the amount of commission income transferred to the "payroll" account and never discussed with Mr. Soave how to properly account for the Agency's gross receipts. Mr. Soave simply accepted the figures supplied by petitioner. Indeed, for Mr. Soave to have determined the correct commission income earned by petitioner during the year in issue, he would have had to completely analyze and review the everyday affairs and operations of the Agency, a task he was not employed to undertake. To calculate the business expenses reported on petitioner's Schedule C, Mr. Soave used the yearly totals from the check register summary, the Agency's payroll records, *249 and additional records brought to his attention. The check register summary, as discussed earlier, was compiled by Mr. Soave using the monthly check registers prepared by petitioner. Mr. Soave never asked to examine any additional financial records concerning the Agency. In 1979, the Agency received the following commissions from insurance carriers through the direct billing method: INSURANCE COMPANY
AMOUNT
National Ben Franklin
$ 128.10   American Auto Inter-Insurance
Exchange (AAA)  1,103.67
Republic National
[4] 9,201.47
Michigan Basic Property
[5] 445.78 State Farm
[6] 1,357.90
Total
$ 12,236.92
These commissions were received in the form of 53 checks paid to the Agency throughout 1979. Fourteen of these checks, totalling $ 2,867.66 [7] in commissions, *250 were recorded in the cash journal and deposited to the "agency" account. The remaining 39 checks, totalling $ 9,369.26 [8] in commission income, were not recorded in the cash journal. These checks were endorsed and cashed by petitioner. Monthly statements from six insurance companies report that the Agency received the following commissions under the agency billing method during 1979: INSURANCE COMPANY
AMOUNT
Auto-Owners Insurance
[9] $ 86,154.14 Michigan Basic Property
3,035.86
Auto-Owners Life Insurance
644.69
National Ben Franklin/Continental
Insurance/Buckeye Union Co.
32,457.79
Total
$ 122,292.48
Petitioner deposited $ 985,012.19 in the "agency" account during 1979. Of this amount, $ 8,049.50 constituted redeposits of cash and bad checks and $ 3,440.08 constituted amounts received by the Agency in 1978 that were reflected on the January 1979 bank statement. During the year in *251 issue, bank statements indicate that petitioner disbursed $ 995,226.50 out of the "agency" account. This amount included seven checks totalling $ 21,304.55 that were written out of the "agency" account to various payees during 1978, but were not reflected on the bank statements until 1979. Also included in the amount disbursed out of the "agency" account during 1979 is $ 3,570.50 in bad checks debited as a charge to the "agency" account during 1979. Checks totalling $ 5,678.06 were written on the "agency" account during 1979, but were not reflected on the bank statements until January 1980. Petitioner drew the following checks on the "agency" account payable either to cash or to himself: DATE
PAYEE
AMOUNT
03-26-79
Cash
$ 1,000.00
04-17-79
Cash
700.00
04-28-79
Cash
1,500.00
05-19-79
Cash
1,200.00
06-02-79
Cash
1,500.00
06-09-79
Cash
1,500.00
06-21-79
Cash
2,000.00
06-23-79
Dino Bencivenga
2,000.00
08-06-79
Cash
1,600.00
08-11-79
Cash
1,600.00
08-14-79
Cash
500.00
09-01-79
Cash
1,600.00
09-11-79
Cash
1,600.00
10-10-79
Cash
1,500.00
10-20-79
Cash
500.00
11-08-79
Cash
1,600.00
12-06-79
Cash
1,600.00
12-29-79
Cash
2,000.00
*252 These checks, totalling $ 25,500, all of which appear on the "agency" account bank statements for 1979, were endorsed and cashed by petitioner. On September 3, 1986, petitioner was indicted by a Federal grand jury and charged with two counts of income tax evasion for the 1980 and 1981 tax years. On June 2, 1987, petitioner was acquitted of the criminal tax evasion charges. United States v. Bencivenga, Criminal Action No. 86-CR-80707 (E.D. Mich.). OPINION Assessment of the deficiency and addition to tax is barred by the statute of limitations unless respondent can prove that an exception applies. Sec. 6501. Respondent alleges that the exception to the statute of limitations for fraud applies. Sec. 6501(c)(1). Respondent bears the burden of proving fraud. Sec. 7454(a); Rule 142(b). In order to establish fraud respondent must show that some part of an underpayment of tax was due to fraud. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). In the alternative, respondent alleges that petitioner omitted from gross income an amount in excess of 25 percent *253 of the amount of gross income stated in the return, and that the six-year statute of limitations should apply. Sec. 6501(e)(1)(A). In the case of a trade or business, such as petitioner's insurance agency, gross income is the same as gross receipts undiminished by the cost of sales or services. Sec. 6501(e)(1)(A)(i). Respondent also bears the burden of proving that the six-year statute of limitations provided in section 6501(e)(1)(A) is applicable. Bardwell v. Commissioner,38 T.C. 84 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Reis v. Commissioner,1 T.C. 9 (1942), affd. 142 F.2d 900 (6th Cir. 1944). Since underreporting of gross receipts is central to respondent's theory of proving either exception to the statute of limitations, we will first address whether respondent has met his burden of proof in that respect. Underreporting of Gross Receipts
Taxpayers are required to keep such books and records as are sufficient to *254 accurately reflect income. Sec. 6001. In the absence of such records, respondent has authority under section 446 to choose and employ an indirect method to reconstruct a taxpayer's income. Epstein v. United States,246 F.2d 563, 566 (6th Cir. 1957); Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978). Even in cases in which books and records are mathematically accurate and internally consistent, the use of income reconstruction has been sanctioned as a means to determine if the taxpayer's records accurately reflect his financial situation. Holland v. United States,348 U.S. 121, 130-132 (1954); Hoffman v. Commissioner,298 F.2d 784, 786 (3d Cir. 1962); Rose v. Commissioner,70 T.C. 558 (1978). "To protect the revenue from those who do not 'render true accounts'," the Government is free to use all admissible evidence to determine if the taxpayer's books accurately reflect his financial history. Holland v. United States, supra at 132 (quoting Spies v. United States,317 U.S. 492, 495 (1943)). In respondent's notice of deficiency he determined that petitioner *255 understated his reported gross receipts by $ 41,208.58. Respondent calculated this figure by comparing gross receipts per petitioner's Schedule C attached to his 1979 return with statements of commissions earned which were issued to petitioner by insurance carriers regarding insurance sales by petitioner. Because petitioner was on the cash basis of accounting and would not have realized income under the agency billing method until paid by his customers and because the statements from the insurance companies do not indicate whether petitioner had been paid by his customers, the statements from the insurance companies, do not, standing alone, prove that petitioner underreported gross receipts. Respondent, in reconstructing petitioner's income, employed a variation of the bank deposits method of computing income. The basic assumption underlying this method of income reconstruction is that if a taxpayer is engaged in an income producing activity and regularly makes deposits to bank accounts, then those deposits, less amounts identified as non-income items, constitute taxable income. United States v. Stone,770 F.2d 842, 844 (9th Cir. 1985); United States v. Morse,491 F.2d 149, 152 (1st Cir. 1974). *256 This Court has repeatedly upheld respondent's use of this indirect method of income reconstruction. Nicholas v. Commissioner, supra at 1065; Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Harper v. Commissioner,54 T.C. 1121, 1129 (1970); Jones v. Commissioner,29 T.C. 601, 613-614 (1957). In attempting to prove an understatement of gross receipts, respondent started with gross deposits made to petitioner's "agency" account during the year in issue. Monthly bank statements reveal that $ 985,012.19 was deposited in the "agency" account during 1979. From this amount, respondent subtracted $ 8,049.50 in nontaxable deposits consisting of redeposits of cash and bad checks, and $ 3,440.08 in 1978 receipts that are reflected in various 1979 bank statements. The result yields total deposits in 1979 of $ 973,522.61. As discussed previously, the cash journal shows that most of the individual receipts making up these deposits were in odd dollar amounts of less than $ 300, while the remaining deposits were also mostly in odd dollar amounts and were shown in *257 the cash journal to be from sources that appear to be business clients. Receipts of this type have the inherent appearance of business income. See United States v. Esser,520 F.2d 213, 217 (7th Cir. 1975); United States v. Lacob,416 F.2d 756, 760 (7th Cir. 1969); United States v. Procario,356 F.2d 614, 618 (2d Cir. 1966). Respondent then examined the monthly bank statements and determined that a total of $ 995,226.50 was disbursed from the "agency" account during 1979. From this amount, respondent subtracted $ 21,304.55 representing checks written in 1978 that cleared in 1979. The charges to the account were also reduced by $ 3,570.50, representing previously deposited bad checks that the bank debited as a charge to the account. Respondent also reduced the amount of charges by $ 96,116.91, the amount of commission income reported by petitioner on his 1979 Federal income tax return. Next, respondent reduced the charges to the account by $ 25,500.00, an amount representing the 18 checks drawn by petitioner either to himself or to cash during the year. As a final adjustment, respondent increased the total charges to the *258 account by $ 5,678.06, an amount representing checks written in 1979 that were posted in 1980. These adjustments result in a figure of $ 854,412.60. This amount, respondent contends, represents the Agency's total disbursements for insurance premium payments, premiums returned to insureds, and noncommissionable items during 1979. Respondent continued his calculation by subtracting the net disbursement figure from the net deposit figure, arriving at a gross receipt total of $ 119,110.01. To this figure, respondent added $ 9,369.26 representing commission checks received by petitioner under the direct billing method that were not deposited in the "agency" account. Respondent also added the $ 6,703.82 claimed by petitioner as returns and allowances to the gross receipts total. Respondent contends that petitioner improperly reduced the gross receipts figure reported on his Schedule C by this amount. Respondent's calculation yields a total of $ 135,183.09 in gross receipts. Subtracting the gross receipts figure reported on petitioner's 1979 return from the gross receipts figure calculated above, respondent determined an understatement of $ 39,066.18. [10]
*259 Respondent's calculation is illustrated in the following manner: Deposit Analysis - Agency Account
Total deposits per bank statements - 1979  $ 985,012.19 Less: Nontaxable deposits  (8,049.50)
Less: Deposits made in 1978 posted on 1979  bank statements        (3,440.08)
Deposits - 1979  $ 973,522.61 Disbursement Analysis - Agency Account
Total charges to account  per bank statements - 1979    $ 995,226.50 Less: Checks written in 1978  posted on 1979 bank statements        (21,304.55)
Less: Debits for previously deposited  bad checks        (3,570.50)
Less: Transfers to payroll account  (96,116.91)
Less: Checks written to cash or  Dino Bencivenga        (25,500.00)
Add: Checks written in 1979 posted  on 1980 bank statements        5,678.06 Net disbursements for insurance  premium payments, premiums returned    to insureds, and noncommissionable items    $ 854,412.60 Excess deposits per cash receipts  and disbursements analysis    (Deposits minus net disbursements)    119,110.01 Add: Commissions and returned premiums  not deposited to account    9,369.26 Add: Returns and allowances not  transferred back from payroll account        6,703.82 Total gross receipts  $ 135,183.09 Less: Gross receipts per return  96,116.91 Understatement of gross receipts per analysis  $ 39,066.18  *260 Petitioner challenges respondent's reconstruction of his income on several grounds and contends that respondent has failed to meet his burden of proof. In particular, petitioner claims that the methodology employed by respondent in reconstructing the Agency's income is flawed. Our examination now turns to these arguments. Petitioner contends that respondent improperly relied on the insurance carrier agency billing statements in reconstructing the Agency's income. These monthly statements are prepared by the individual insurance carriers doing business with petitioner under the agency method of billing. The monthly statements contain line entries listing the names of the insureds, their policy numbers, a transaction code, an effective date, a gross premium amount, a commission rate, a commission amount, and a net amount due the insurance carrier. The gross premiums, commissions, and net amount due are then totalled for the month. These totals appear at the bottom of the last page of each monthly statement. The amount reflected in the commissions column is subtracted from the gross premium amount to arrive at the net amount due the insurance carrier. Petitioner claims that *261 the agency billing statements inaccurately report his commission income [11] because, as a cash basis taxpayer, he has no income until he actually receives payment from his clients. Inasmuch as the agency billing statements do not provide any information concerning petitioner's collection of gross premiums from his clients, we agree that the commission amounts reported on the statements cannot be considered income earned by petitioner. We note, however, that although respondent relied on the agency billing statements to prepare the notice of deficiency, he does not attempt to meet his burden of proof by relying on the figures reported on those statements. Instead, respondent's case is based primarily on his reconstruction of petitioner's income using the bank deposits method of income reconstruction. With respect to the bank deposits analysis, petitioner claims that respondent improperly included $ 9,369.26 of commission income in his reconstruction of the Agency's *262 income. Respondent contends that this amount represents commissions earned under the direct billing method that were never deposited in the "agency" account. To arrive at this figure, respondent examined petitioner's bank statements and cash journal and matched each direct commission check petitioner received with a corresponding deposit. From the bank records, respondent determined, and we found as a fact, that petitioner failed to deposit $ 9,369.26 in direct commission payments. Petitioner did not dispute respondent's calculations at trial. Petitioner contends, however, that he did not deposit all of the checks in the "agency" account because they were made payable to him personally and constituted only a small percentage of his total commission income. Petitioner admitted that most of these funds were used by him to pay for his personal expenses. We have some difficulty understanding petitioner's legal argument. There is no dispute that the checks represent $ 9,369.26 in commissions [12] earned under the direct billing method. It makes no difference whether the checks are made payable to petitioner personally or to the Agency. In either situation petitioner is obligated *263 to report the amount as income. Petitioner argued at trial that he "sort of figured those [commission checks] in the computation of the payroll." Petitioner provided no further details and there is no evidence that this computation was ever made. Petitioner, in skirting his established accounting practices, failed to take this amount into income. Petitioner also challenges respondent's treatment of the $ 5,678.06 in checks written on the "agency" account during 1979 that were posted on the January 1980 bank statements. In his computation, respondent included this amount as a disbursement made out of the "agency" account during 1979. Petitioner contends that respondent has failed to introduce any evidence to support this computation.
Respondent's inclusion of this amount in his reconstruction of petitioner's *264 income results in an increase in net disbursements made out of the "agency" account during 1979 of $ 5,678.06 and a corresponding decrease in the amount of excess deposits attributed to petitioner. Although respondent has not explained how he arrived at this figure, [13] we note that the result is favorable to petitioner. [14] The "agency" account bank statement for the period 12/31/79 to 1/31/80 reveals that twenty items, totalling $ 5,681.06, were charged against the account during the first two weeks of January 1980. It is reasonable to conclude that checks written in late December 1979 would probably be presented for payment during the first two weeks of January 1980. Petitioner and respondent have previously agreed to a similar adjustment in which the total charges to the "agency" account were reduced by $ 21,304.55, an amount representing checks written in 1978 that were posted on the January 1979 bank statement. Inasmuch as respondent seeks to credit petitioner for checks written in late 1979 that were not posted on the bank statements until January 1980, and the evidence corroborates this allowance, we agree with respondent. [15]
*265 Petitioner's next argument focuses on the $ 25,500 in checks made payable to either cash or Dino Bencivenga and subsequently endorsed by petitioner. These checks were written out of the "agency" account during the year in issue. Respondent contends that this amount must properly be considered when calculating petitioner's gross income. We agree with respondent. Petitioner stated at trial that he did not receive a salary from the Agency [16] and that he used these checks to pay his living expenses and some business expenses. When asked at trial if this amount was reported as income on his return, petitioner answered yes, but could not point out where it was reported. Here again petitioner has skirted his established accounting procedures. No part of the $ 25,500 was deposited into the "payroll" account. It therefore would not have entered into petitioner's reported income calculations. The entire $ 25,500 was properly included in respondent's calculation. Petitioner submitted the report of an expert witness, Maree Mulvoy. [17] Ms. *266 Mulvoy heads the tax department of a Bloomfield Hills, Michigan accounting firm. In her report, Ms. Mulvoy represents that she is familiar with insurance agency billing procedures and accounting. She then responds to seven questions posed by petitioner's attorneys. Ms. Mulvoy begins by setting forth the differences between the agency billing and direct billing methods of collecting gross premiums. Her response comports with the explanation provided by the parties. The remainder of her report details the accounting procedures a cash basis taxpayer should use to account for income and expenses. Many of the issues raised in the report mirror those raised during trial. Ms. Mulvoy focuses most of her attention on the information contained in the monthly agency billing statements. Inasmuch as petitioner is a cash basis taxpayer, Ms. Mulvoy concludes that the commission figures reported on the monthly statements reflect only the potential income petitioner will earn once he actually receives payment *267 from his clients. Although we agree with this conclusion, we note that respondent does not contend that the commission figures reported on the monthly statements prove commission income. Instead, respondent seeks to meet his burden of proof based on the bank deposits method of proof which is merely corroborated by the monthly agency billing statements. Ms. Mulvoy also explains how she would determine petitioner's income from his bank records, cash receipts journal, and agency billing statements. Her response does not differ greatly from the method detailed by petitioner's accountant during trial. The problem, however, lies in the fact that petitioner diverted a substantial sum of money to his own use without properly recording these amounts in the Agency's books. Without this information, which respondent has established through an examination of petitioner's bank statements and records, it would be impossible to properly calculate petitioner's gross receipts during the year in issue. Ms. Mulvoy's statement of accounting procedures is correct, but her method presupposes that the taxpayer will supply complete and accurate books and records. In this case, such records were not *268 supplied. Ms. Mulvoy concludes her report by addressing the income tax ramifications of the 18 checks totalling $ 25,500 endorsed and cashed by petitioner during the year. Her answer is that an individual does not receive income merely by writing and cashing checks drawn on his business account. We agree with this conclusion, but note again that respondent, in his reconstruction of petitioner's income, did not just simplistically add this amount to petitioner's income. Instead, respondent properly reduced total charges to the "agency" account by this amount as part of his calculation using the bank deposits method of proof. Petitioner also challenges respondent's determination that $ 6,703.82 claimed as returns and allowances on petitioner's Schedule C constitutes commission income. This figure represents premium payments that the Agency made on behalf of its clients during 1979 that were subsequently uncollected. Respondent does not contest this figure, but claims that petitioner incorrectly accounted for it on his original return. Petitioner reduced reported gross receipts of $ 96,116.91 by the $ 6,703.82 reported as returns and allowances on his Schedule C. Respondent, *269 in his reconstruction of the Agency's income, considered the $ 6,703.82 part of the $ 96,116.91 transferred to the "payroll" account during 1979. Respondent contends that petitioner reduced the Agency's gross receipts by $ 6,703.82, but failed to transfer this amount back to the "agency" account. According to respondent, this accounting procedure resulted in deposits to the "payroll" account over and above those reported on the Schedule C. Respondent claims that these excess deposits constitute income. Although we find respondent's factual summary of petitioner's accounting procedures accurate, we disagree with his conclusion. In reconstructing a taxpayer's income using the bank deposits method of proof, amounts claimed by a taxpayer as returns and allowances are irrelevant. Respondent, in his calculations, has accounted for all deposits made to the "agency" account during the year in issue. Because amounts claimed as returns and allowances would be included in this figure, respondent erred by including this amount in his reconstruction of petitioner's income. After an examination of the record, we have found that respondent has established the facts and figures upon which *270 he based his bank deposits computation. Our only disagreement with his analysis of those items is his handling of returns and allowances. Accordingly, we must reduce respondent's computation of gross receipts by the figure of $ 6,703.82. We conclude that respondent has established that petitioner earned gross receipts of $ 128,479.27 [18] during the year in issue. This amount exceeds gross receipts reported on petitioner's income tax return [19] by $ 31,877.67 and results in an omission from gross income of an amount in excess of 25 percent of the amount of gross income stated on that return. Respondent has thus established that the six-year statute of limitations provided by section 6501(e)(1)(A) applies. Since the notice of deficiency was mailed within six years of the date petitioners filed their return, respondent has proven that the statute of limitations does not bar assessment of the taxes in issue. *271 Fraud
Respondent has the burden of proving fraud by clear and convincing evidence. Doncaster v. Commissioner,77 T.C. 334, 336 (1981); sec. 7454(a); Rule 142(b). To meet this burden, respondent must show petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Standing alone, an understatement of income does not constitute fraud. Instead, fraud is an issue of fact to be resolved after considering the entire record. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent may, however, prove *272 fraud through circumstantial evidence since direct evidence of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra at 1123. The deficiency in this case resulted from petitioner's failure to record receipts in accordance with his established accounting procedures. The evidence demonstrates that petitioner was actively involved in the daily financial operations of the Agency. Petitioner regularly filled out deposit slips, was aware of incoming receipts, and was solely responsible for computing the Agency's commission income. Petitioner knew that his accountant would rely entirely on the deposits made to the "payroll" account to compute the Agency's gross receipts, yet he purposely failed to transfer a significant amount of commission income to that account. He presented inaccurate records to his accountant knowing that these figures would be used to complete the tax return. This conduct evidences fraud. Estate of Temple v. Commissioner,67 T.C. 143, 162 (1976). [20]
The record reveals that *273 petitioner endorsed and cashed 39 direct commission checks totalling $ 9,369.26. These checks are not recorded in the agency cash journal and were not reported as income by petitioner. Petitioner admitted at trial that these checks should have been included in income, but was unable to indicate at trial where they were reported on his income tax return. The diversion of receipts to personal use evidences fraud, particularly in circumstances where the taxpayer knows that no record of receipt will be made. Moore v. Commissioner,T.C. Memo. 1977-275, affd. 619 F.2d 619 (6th Cir. 1980); Rossmann v. Commissioner,T.C. Memo. 1984-231. In Estate of Temple v. Commissioner, supra at 162, we held that a taxpayer who personally cashed business checks and caused no record to be made in a cash journal acted in a fraudulent manner. Many of the facts in Temple are similar to those present here. In both cases the taxpayers were aware that their return preparers were relying on the information contained in cash journals and bank records to complete the tax returns. In both cases the return preparers were not hired to *274 and did not conduct an independent audit to verify the figures supplied by the taxpayers. Indeed, neither petitioner's accountant nor the return preparer in Estate of Temple were ever informed that they could not rely on their employer's records to prepare tax returns. Finally, in both cases the taxpayers were actively involved in the daily financial affairs of their businesses. Petitioner also withdrew $ 25,500 from the "agency" account during 1979 and admittedly used such proceeds for personal living expenditures. It is obvious that such amounts would never be reflected in petitioner's "payroll" account, which he knew was the only source of information that his accountant would rely on in computing his taxable income. Petitioner's trial testimony that he somehow accounted for this $ 25,500 in determining his income, coupled with his failure to explain how he did so and our conclusion that his method of determining income precluded any possibility that he accounted for these cash withdrawals, is indicative of fraud. Petitioner was a successful businessman who, as we have already found, earned substantially more income than he reported on his income tax return. It is unlikely *275 that petitioner would mistakenly fail to realize this. In addition, the evidence shows that petitioner was receiving monthly statements from insurance carriers showing that the gross commissions that he was earning were substantially greater than the gross commissions reflected on his records and subsequently on his return. Even though we have held that these statements do not prove that a cash basis taxpayer actually received the commissions reflected on the insurance company statements, the discrepancy between those statements and petitioner's records would have alerted any reasonable businessman. We also believe that the insurance company statements corroborate the bank deposits method employed by respondent. Petitioner, in challenging the fraud determination, places great weight on the decision of the district court judge acquitting him of criminal tax evasion charges for the 1980 and 1981 tax years. A taxpayer's prior acquittal of attempted tax evasion does not bar the Commissioner from proving fraud civilly. Helvering v. Mitchell,303 U.S. 391, 397 (1938); Neaderland v. Commissioner,424 F.2d 639, 642 (2d Cir. 1970). We note that although *276 petitioner's acquittal of criminal fraud charges is generally entitled to some evidentiary weight, petitioner was acquitted of charges relating to tax years not currently before this Court. It is also important to note that the Government's criminal fraud case was apparently based upon the commission amounts reported on the insurance agency billing statements, the testimony of insurance agency representatives, petitioner's cancelled checks, and his tax returns. The Government apparently did not attempt to reconstruct petitioner's income using the bank deposits method of income reconstruction. We therefore decline to consider the findings of the district court. On the basis of the entire record, we conclude that petitioner fraudulently understated his income with the intent to evade taxes during 1979. Accordingly, petitioner is liable for the additions to tax under section 6653(b) and the fraud exception to the normal period for making assessments is applicable. Deficiency Amount
Once having found that respondent has met his burden of proof regarding the statute of limitations and *277 fraud, the burden is upon petitioner to establish that the deficiency determined by respondent is incorrect. Willits v. Commissioner,36 B.T.A. 294, 300 (1937). [21] This is so even though respondent has met his burden by proving an amount less than that determined in the notice of deficiency. If petitioner does not meet his burden, the deficiency determined by respondent will be sustained. Petitioner has not met his burden of proving that the deficiency amount determined by respondent is incorrect. That amount is slightly greater than the amount which respondent was able to affirmatively prove through his bank deposit analysis. Even though the insurance company statements which form the basis for the deficiency determination were insufficient to prove the amount of the deficiency, their use is a far cry from being arbitrary and unreasonable, especially when they are corroborated in large part by the bank deposit analysis. Petitioner offered no specific evidence to meet his burden of proving that respondent's determination of gross commissions was incorrect. In his notice of *278 deficiency, respondent completely disallowed several of petitioner's business deductions and partially disallowed several other claimed deductions. Petitioner offered little evidence at trial to substantiate his claimed business deductions. The majority of the evidence presented is attributable to Marco Soave, petitioner's accountant and return preparer during 1979. Mr. Soave testified that the actual figures on the return were derived from figures reported on the check register summary prepared from the monthly check registers. When asked whether he was satisfied that documents substantiating each deduction existed, Mr. Soave replied that he relied on either the figures reported in the check registers or numbers provided by petitioner. Many of the figures contained in the check register do not match those reported on the return. Mr. Soave stated at trial that some deductions constitute percentage deductions and some constitute reductions for personal expenses. No specific evidence having been offered, we find that petitioner has failed to prove entitlement to the disallowed expenses. In his notice of deficiency, respondent determined $ 250.31 in unreported interest for 1979. *279 Petitioner offered no proof at trial and respondent must be sustained. Having determined all issues in favor of respondent, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In addition to the exception to the statute of limitations for fraud, respondent has affirmatively alleged that petitioners omitted from gross income amounts in excess of 25 percent of the gross income stated in the 1979 return and that under section 6501(e)(1)(A)↩ the tax for that year may be assessed at any time within 6 years after the return was filed.
3. We find it quite unlikely, given petitioner's testimony concerning his method of calculating commission income, that he always received commission income in multiples of $ 100.↩
4. In the Stipulation of Facts, the parties report two different amounts as received from Republic National Insurance under the direct billing method. An examination of the record reveals that the above figure is correct. ↩
5. Total payments received of $ 445.78 included a $ 358.66 return of premium. ↩
6. Total payments received of $ 1,357.90 included a $ 376.73 return of premium.↩
7. Total payments of $ 2,867.66 included a $ 358.66 return of premium. ↩
8. Total payments of $ 9,369.26 included a $ 376.73 return of premium.↩
9. Due to a computational error, this amount is incorrectly reported as $ 87,154.64 in the Stipulation of Facts.↩
10. This amount is $ 2,142.40 less than the amount determined in the notice of deficiency.↩
11. Petitioner's social security number is printed on each page of the statement along with a notice that the insurance carrier will use that number to report commission earnings to the Internal Revenue Service.↩
12. The checks included a $ 376.73 return of premium. Under the bank deposits analysis the entire $ 9,369.26 represents income to petitioner because the returned premiums would have been returned to insureds through a disbursement out of the "agency" account during the year in issue. Disbursements from the "agency" account are reflected in the bank deposit method.↩
13. Respondent conceded this amount on brief. ↩
14. If the $ 5,678.06 is not included as a disbursement from the "agency" account during 1979, the amount of excess deposits calculated using the cash receipts and disbursements analysis would increase by a corresponding amount, thereby increasing petitioner's understatement of gross receipts. ↩
15. As noted previously, respondent is required to demonstrate that he has tried to discover and exclude all nonincome items from the determined tax deficiency. United States v. Lawhon,499 F.2d 352, 356 (5th Cir. 1974); United States v. Morse,491 F.2d 149, 152 (1st Cir. 1974). Respondent reviewed petitioner's bank statements and afforded petitioner the benefit of the doubt by incorporating this figure into his computation. No additional proof is required of respondent. See United States v. Stein,437 F.2d 775, 778↩ (7th Cir. 1971).
16. The check register summary of the "payroll" account indicates that petitioner received $ 32,700 as a "draw" during the year in issue.↩
17. Petitioner submitted the report of his expert pursuant to Rules 71(d)(2) and 143(f). At trial, petitioner and respondent orally stipulated to accept the report into evidence.↩
18. $ 135,183.09 (gross receipts per respondent's bank deposit analysis) minus $ 6,703.82 (returns and allowances) equals $ 128,479.27. ↩
19. Gross receipts reported on the return consisted of $ 96,116.91 reported on Schedule C and $ 484.69 reported as interest income.↩
20. See also Moore v. Commissioner,T.C. Memo. 1977-275, affd. 619 F.2d 619↩ (6th Cir. 1980).
21. See also Sclafani v. Commissioner,T.C. Memo. 1963-298↩.